GEORGE S. CARDONA
Acting United States Attorney
WAYNE R. GROSS
Special Assistant United States Attorney
Chief, Santa Ana Branch Office
GREGORY W. STAPLES
Assistant United States Attorney
California Bar Number: 155505
CRAIG H. MISSAKIAN
California Bar Number: 125202
    United States Courthouse
    411 West Fourth Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3535
    Facsimile: (714) 338-3564
    E-mail address: greg.staples@usdoj.gov

Attorney for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) SA CR No. 05-293(B)-CJC |
| | ) |
|         Plaintiff, | ) <u>GOVERNMENT'S TRIAL MEMORANDUM</u> |
| | ) |
|         v. | ) Trial:    March 27, 2007 |
| | ) Time:     9:00 a.m. |
| CHI MAK, et al., | ) |
| | ) |
|         Defendants. | ) |
| | ) |

    The United States of America, by and through its undersigned

attorney, respectfully submits this trial memorandum providing an

////

////

////

////

introduction to the facts of this case, a briefing of the law, and a discussion of issues which may be raised at trial.

Dated: March 20, 2007          Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney


                              _____/S/_____
                              GREGORY W. STAPLES
                              CRAIG H. MISSAKIAN
                              Assistant United States Attorneys


**[Tables of Contents and Authorities attached at end of document]**

I.   **STATUS OF THE CASE**

A.   Trial as to defendant Chi Mak is set for March 27, 2007.  Trial for the remaining four defendants is set for May 15, 2007.

B.   Defendant Chi Mak has been in custody since his arrest on October 28, 2005.

C.   The second superseding indictment contains fifteen counts.  Count 1 charges defendant with conspiracy to violate export control laws in violation of 22 U.S.C. § 2778(b)(2) and 22 C.F.R. § 127.1(a)(3).  Counts 2 through 4 charge defendant with attempting to export or exporting a defense article to the PRC in violation of 22 U.S.C. § 2778(b)(2) and (c), and 22 C.F.R. § 127.1(a)(1) and (d), and § 127.3.  Count 6 charges defendant with acting as an agent of a foreign government, namely the PRC, without giving prior notification to the Attorney General of the United States, in violation of 18 U.S.C. § 951.  Count 11 charges defendant with making false statements to the FBI in violation of 18 U.S.C. § 1001.

II.  **STATEMENT OF FACTS**

The government expects the proof at trial to establish the following:

A.  **The Copying and Encryption of Defense Technology Files**

The defendants were arrested on October 28, 2005, when Tai Mak and his wife, Fuk Li, were preparing to board a flight to the PRC.  Defendant and his wife, Rebecca Chiu, were arrested at their home at the same time.  Search warrants were executed at defendants' residences, defendant's workplace, and for the carry-on and checked luggage of Tai Mak and Fuk Li.

In the search of Fuk Li's luggage, agents found a commercially-produced CD package for learning English.  Inside the cover, hidden behind disk 3 of the commercially produced CDs, was a CD marked "10/25/05" (the "LAX disk").  The LAX disk contained two MP3 music files, three Adobe Acrobat files containing power points of lectures and notes from college that belonged to Billy Mak, and a file folder with the name "DLL." Within the DLL folder were three subfolders named Disk 1, Disk 2, and Disk 3, which contained encrypted files of defense-related information.  When decrypted and extracted, the subfolder files exactly matched the files on three disks given to Tai Mak by defendant and Rebecca Chiu.  The three disks were found in the search of Tai Mak's residence.  The original three disks used to make the three copies were found in defendant's home.

The encrypted files contained defense-related information, including two documents that were export-controlled.  One of the documents, co-written by defendant, contained information that should have been classified as "Confidential/NOFORN."  In addition, export-controlled documents relating to the Navy's next generation warship (the DDX program) were found on a laptop belonging to Tai Mak and Billy Mak that had been encrypted in 2004.  Evidence recovered from defendant's home shows that he and his wife traveled to the PRC a few weeks after the DDX files were encrypted.  The original DD(X) disk was found in defendant's home.  The DD(X) information was also found on the shared computer drive at defendant's workplace.  Each version exactly matches the DD(X) files on the laptop.

The search of defendant's home resulted in the recovery of

hundreds of defense-related documents, including many that were marked NOFORN[1] or proprietary to certain defense contractors. Many of the documents found in defendant's home match technologies and weapon systems found on four tasking lists. Two of the tasking lists were recovered from defendant's trash during a search conducted in March 2004, and two were discovered during the October 28, 2005, search of his home. The evidence will show that defendant was collecting technical data found on the tasking lists for the PRC government.

Defendant was a senior engineer for Power Paragon, Inc. ("PPI"), a defense contractor in Anaheim, which, according to its Facility Director, Fred Witham, does almost all of its business through contracts or subcontracts with the Navy. The main project defendant worked on at the time of his arrest was Quiet Electric Drive ("QED"), which was intended to further decrease the signature data emitted by U.S. Navy submarines and surface warships. At trial, the government will offer expert testimony to show that submarine signature data is extremely sensitive information, and that revealing it endangers the lives of officers and sailors who serve on submarines.

The investigation of defendant began in February 2004. Court-ordered wire taps were placed on defendant's home telephone number in June 2004. Microphones were later placed inside the residence and the car owned by defendant. A closed-circuit television camera was placed in defendant's home above his dining

---

[1] NOFORN is a restriction placed on documents that contain Naval Nuclear Propulsion Information. NOFORN documents cannot be given or shown to anyone who is not a U.S. citizen with a "need to know."

room table in October 2005.  In June 2004, wire taps were placed on telephones belonging to Tai Mak and Fuk Li.  A microphone was later placed in one of their cars.  Based on this surveillance, the following was learned.

On October 19, Tai Mak called a Mr. Pu in the PRC saying he was from "Red Flower of North America."  Tai Mak worked for Phoenix Satellite Television as a sound engineer.  Phoenix Satellite Television is not referred to as Red Flower of North America.  Testimony at trial will show that other Chinese intelligence units bear the names of flowers, such as Winter Chrysanthemum and Autumn Orchid, and that agents are taught to use cover stories to mask where they are from.  Tai Mak told Mr. Pu that he was coming to Guangzhou to attend a trade fair.  The President of Phoenix Satellite Television was interviewed and said that Tai Mak was not traveling to China on October 28 for business purposes.  Tai Mak told Pu that he will be coming on October 30 and will be bringing his "assistant."  Pu told Tai to call him on his cell phone from the airport in Guangzhou using a calling card.

On October 20, Tai Mak spoke to his wife, Fuk Li, on the phone.  They discussed Tai Mak's efforts to reach defendant, and the need to encrypt the information that defendant would bring them.

On October 21, Tai Mak told defendant that he was going to Hong Kong.  Defendant urged his brother to go to mainland China. Defendant said that he would bring something for his brother.

On October 23, defendant and his wife were seen copying disks on defendant's laptop computer.  While they copied the

4

disks, defendant and his wife could be heard discussing the contents of the disks they were copying.  They were recorded saying the following: "QED," referring to the program defendant worked on; "Propulsion 2004" referring to a symposium held in 2004 on propulsion in Navy warships and submarines; "Paragon," referring to PPI; "carrier program," referring to an aircraft carrier program; "American Naval Engineering," referring to ASNE; and "Jacksonville" and "U.S. Naval Academy," referring to a conference in Jacksonville.  Defendant refers to "programs" that were written by PPI as opposed to other programs on the disks.  After copying three disks, defendant and his wife were followed to Tai Mak's home, where the disks were given to Tai Mak.

The next day, October 24, defendant called Tai Mak.  Defendant asked "have you got everything prepared for the trip?"  Tai Mak replied "Not yet."  Later that day, Tai Mak called Billy Mak and told him to pick up "three or four CDs, those which can be used for recording . . . I have something to do with them."

On October 25, Billy Mak called Tai Mak from home and asked for the location of the encryption key so that he could encrypt the disks.  Later that day, Tai Mak called Billy Mak from home and asked where he was.  Tai Mak said "I saw that your computer is just running like that."  Billy replied "Oh yes, that's because I was burning the CD for you."  Billy Mak told Tai Mak that the CD was burning and that he was coming home to adjust it.

On October 28, Tai Mak, Fuk Li, and Billy Mak were followed from their home in Alhambra to LAX.  A microphone in their car picked up a conversation in which Tai Mak described defendant as being very nervous about the encrypted information on the LAX

disk.

**B.   Post-arrest Statements by Defendant**

**1.   Defendant's October 28 statement**

Following his arrest on October 28, 2005, defendant was interviewed at FBI offices in Westwood.  Prior to the arrests it was arranged to videotape the interview.

During the interview, defendant first said there was nothing of importance on the disk.  Later he admitted there was some sensitive information on the disk, but downplayed its importance. Defendant repeatedly told agents that he had given the disk to Tai Mak so that he could buy technical books for defendant while Tai Mak was in Hong Kong.  Defendant did admit that there were export-controlled documents on the disk and that it was illegal to send some types of information overseas, and that he had received ITAR training as recently as the previous day.

**2.   Defendant's October 30 statement**

Defendant was interviewed again on Sunday, October 30.  The agents who conducted the interview will testify that they decided at the spur of the moment to go to Santa Ana Jail and try to interview defendant again.  The interview was not videotaped because no plans had been made in advance to conduct the interview.  In the second interview defendant admitted he lied during the first interview, and that he had given the LAX disk to his brother to deliver to a Mr. Pu, who would deliver the disk to the government of the PRC.  He admitted that the LAX disk contained export-controlled items that should not have been sent overseas.  Defendant also admitted that he had been passing information to the PRC since 1983, and named several technologies

he had passed. Those technologies included power distribution technology for the Aegis "Spy-1" radar system.

**C. Discovery of Documents Gathered by Defendant at His Home**

In addition to the documents found on the LAX disk, agents searched defendant's home and office and found numerous other documents, including almost a thousand documents at the home. These documents covered a variety of technical areas, including power electronics, Virginia class submarines, and QED, to name a few. While many of the documents were unclassified, some of the documents carried that caveat NOFORN and involved Naval Nuclear Propulsion Technology. Some documents were also marked proprietary, belonging to companies such as Electric Boat, Raytheon, Ingalls, TRE Semiconductor, Electromask, and Teledyne Inet. Many of these documents contain sensitive military-related information that are export-controlled and which match items on the various tasking lists. The government will call a summary witness under Federal Rule of Evidence 1006 to testify about the nature of the documents.

**D. The Charged Documents**

**a. The first ITAR document**

One of the encrypted files on the LAX disk is entitled "Solid-State Power Switches for Source Transfer and Load Protective Functions." The document was written by defendant and two other PPI engineers. This document was presented by defendant on February 17, 2005, at the "ASNE [American Society of Naval Engineers] Reconfiguration and Survivability Symposium 2005," held in Jacksonville, Florida. The conference was open to members of ASNE only, which included non-citizens. Defendant did

not obtain company authorization prior to presenting the paper at the conference.  The document deals with power disruption on "mission critical technology on ships."  "Reconfiguration and Survivability" refers to technology that allows a warship that has been damaged to continue functioning and fighting, in part, by redistributing power around the damaged area or systems on the ship.

### b.   The second ITAR document

A second document found on the LAX disk was entitled "5 MW High Efficiency Quiet Electric Drive Demonstrator."  This document was presented by defendant at the ASNE Advanced Naval Propulsion Symposium held at Herndon, Virginia, on November 16-17, 2004.  Defendant did not obtain company authorization prior to presenting the paper at the conference.  The paper discusses minimizing switching losses and harmonic distortion on U.S. Navy vessel electrical power systems.  The conference was open to members of ASNE only, which included non-citizens.  Review of this document, co-authored by defendant, by the Office of Naval Research revealed that it contained unmarked classified information.

### c.   The third ITAR document

A laptop belonging to Tai Mak contained sixty files that were copied on to the laptop and encrypted on February 11, 2004. The files were subsequently deleted.  The files were part of a Technical Purchase Requisition Statement of Work by Northrop Grumman pertaining to the DDX program.  The DDX program involved the development of the next generation of U.S. Navy surface warships.  The document entitled "Proposal, DD(X) Zonal Power,

Revision A (RFP DD(X)00017)" was identified by the State Department as being on the USML.  Each page bears a logo that states "Future Surface Combatant Program DD(X)."  The face sheet of the document bears the following restriction:

> DISTRIBUTION STATEMENT D: Distribution authorized to DoD and
> DoD contractors only; Critical Technology (date).  Other
> U.S. requests shall be referred to PEO(S).

"PEO(S)" stands for Program Executive Office (Ship), which refers to a Naval Officer who is the executive officer overseeing a particular program for the Department of the Navy.

The DD(X) documents found on the laptop were also found on a disk in defendant's residence.  The DD(X) documents were maintained on a shared drive at PPI.  Defendant worked on a proposal for PPI in response to the request.  The files on the PPI shared drive, the disk at defendant's house, and the laptop at Tai Mak's house were determined to be forensic matches.

As noted, the DDX files were encrypted on February 11, 2004. On March 5, 2004, defendant and Rebecca Chiu traveled to Seoul, Korea.  A handwritten travel itinerary found in defendant's trash showed that defendant and his wife were in Shenzen in the PRC during that trip, prior to returning to the U.S. on March 16, 2004.  Evidence will show that an e-mail address found on a code word list was established in China while defendant was in the PRC on this trip.

The government will also offer evidence that the State Department has certified as export-controlled other documents found in defendant's home.

////

### E.  The Encryption Program

The laptop computer seized from Tai Mak's residence contained encryption software.  The software was a custom designed program.  A "Dr. Cheng" is listed for the program.  Also seized from Tai Mak's house were two floppy disks containing the encryption key.

### F.  PPI Security/ITAR Training

Evidence will show that PPI took a number of steps to safeguard the technology at PPI.  Those steps include the following:

1.  All classified material was maintained in one of three GSA-approved safes, with access limited to a few employees.

2.  NOFORN material was kept in an area separated from the rest of the PPI plant.  That area required special access.

3.  PPI had in place security policies regarding the handling of classified and NOFORN documents, including a prohibition on taking NOFORN documents home.

4.  PPI conducted in-house training to all its employees regarding the safe handling of documents.  This training included ITAR training.

5.  Signs and posters were placed throughout the PPI facility warning employees about the restrictions on the transfer of documents.

6.  PPI had an Export Compliance Coordinator ("ECC") to assist engineers if they wanted to present papers at conferences.

10

Evidence at trial will show that defendant received the ITAR training but that he did not seek approval from the ECC to present the charged documents at conferences or send the charged documents to China.  Evidence will also show that defendant engaged in e-mail traffic in March and September 2005 in which he was advised of the criminal penalties for violating ITAR.

**G.  Certification by Department of State**

The State Department has certified that the two documents on the LAX disk and the DDX documents are technical data and thus export-controlled.  The State Department has also certified that none of the defendants applied for a license to export the charged documents.

**H.  Certification by the Attorney General**

The Attorney General has certified that defendant did not give notification that he was acting as an agent of the PRC.

**III. <u>ELEMENTS OF OFFENSES</u>**

**A.  <u>ITAR</u>**

Title 22, United States Code, Section 2778(b)(2) states the following:

(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter, except that no license shall be required for exports or imports made by or for an agency of the United States Government (A) for

11

official use by a department or agency of the United States
Government, or (B) for carrying out any foreign assistance
or sales program authorized by law and subject to the
control of the President by other means.

* * *

(c) Criminal violations; punishment

Any person who willfully violates any provision of this
section or section 2779 of this title, or any rule or
regulation issued under either section . . . shall upon
conviction be fined for each violation not more than
$1,000,000 or imprisoned not more than ten years, or both.
The elements of the crime are as follows:

(1) Defendant exported, or attempted to export, a defense
article that was listed on the United States Munitions List
("USML");

(2) Defendant did not obtain the required license or written
approval for such export from the Department of State,
Office of Defense Trade Controls; and

(3) Defendant acted willfully – that is, deliberately and
intentionally with the purpose of violating a known legal
duty not to export defense articles from the U.S.

Contrary to statements made by defendant's counsel in court, the
USML does not "list" specific documents, such as the documents
charged in this case.  The USML lists types of technology that
are export-controlled.  It is therefore inaccurate to state that
the QED document, for example, was not on the USML until it was
certified by the State Department following defendant's arrest.
The technology was on the USML.  The certification by the State

12

Department is that the document in question contains technology that requires an export license before sending to another country or giving to a foreigner in this country.

### 1. Willfulness

An ITAR violation is a specific intent crime.  This requires that the government prove a defendant acted with the intent to violate a known legal duty not to export the given items.  It does not require proof that a defendant knew of the licensing requirement specifically.

In <u>United States v. Lizarrga-Lizarrga</u>, 541 F.2d 826 (9th Cir. 1976), the Ninth Circuit held that the precursor statute to § 2778 required a specific intent instruction.  This required that the government prove that the "defendant's act or failure to act is voluntary and purposeful [and was] committed with the specific intent to do or fail to do what he knows is unlawful."  <u>Id.</u> at 828.  "[T]he government must prove that the defendant voluntarily and intentionally violated a known legal duty not to export the proscribed articles."  <u>Id.</u> at 829.

### B. <u>ITAR Conspiracy</u>

Title 22, United States code Section 2778 provides, in pertinent part as follows:

(b) Registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services

*****

(2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services

13

designated by the President under subsection (a)(1) of
this section may be exported or imported without a
license for such export or import, issued in accordance
with this chapter and regulations issued under this
chapter, except that no license shall be required for
exports or imports made by or for an agency of the
United States Government (A) for official use by a
department or agency of the United States Government,
or (B) for carrying out any foreign assistance or sales
program authorized by law and subject to the control of
the President by other means.

*****

(c) Criminal violations; punishment

Any person who willfully violates any provision of this
section or section 2779 of this title, or any rule or
regulation issued under either section . . . shall upon
conviction be fined for each violation not more than
$1,000,000 or imprisoned not more than ten years, or both.

Regulation 22 C.F.R. § 127.1 provides, in pertinent part, as
follows:

(a) It is unlawful:

(1) To export or attempt to export from the United
States, or to reexport or retransfer or attempt to
reexport or retransfer from one foreign destination to
another foreign destination by a U.S. person of any
defense article or technical data or by anyone of any
U.S. origin defense article or technical data or to
furnish any defense service for which a license or

14

written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;

(2) To import or attempt to import any defense article whenever a license is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls;

(3) To conspire to export . . . any defense article or to furnish any defense service for which a license or written approval is required by this subchapter without first obtaining the required license or written approval from the Directorate of Defense Trade Controls. . . .

The elements of an ITAR conspiracy are as follows:

(1) There was an agreement between two or more persons to commit at least one crime;

(2) The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

The government is not required to prove an overt act under an ITAR conspiracy.

**C.  Foreign Agent Charge**

Title 18, United States Code, Section 951 provides, in pertinent part, as follows:

(a) Whoever, other than a diplomatic or consular officer or attache, acts in the United States as an agent of a foreign

15

government without prior notification to the Attorney General if required in subsection (b), shall be fined under this title or imprisoned not more than ten years, or both.

* * *

(d) For purposes of this section, the term "agent of a foreign government" means an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official. . . .

The elements of the crime are as follows:

1.   Defendant acted in the United States as an agent of a foreign government, in this case, the government of the People's Republic of China;

2.   Defendant failed to notify the Attorney General of the United States that he would be acting in the United States as an agent of the People's Republic of China prior to so acting; and

3.   Defendant acted knowingly, and knew that he had not provided prior notification to the Attorney General.

Since 1989, there has been an arms embargo against the PRC as a result of the Tiananmen Square Massacre in 1989.  The embargo restricts the export to the PRC of defense articles, defense services, and technical data.  Pursuant to C.F.R. 126.1, this restriction applies regardless of whether the technical data was in the public domain.  Thus, the transfer of any technical data relating to military systems to the PRC is prohibited regardless of whether that information is in public domain.

**D.   False Statement**

Title 18, United States Code, Section 1001 provides, in

16

pertinent part, as follows:

    (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-

                        * * *

    (2) makes any materially false, fictitious, or fraudulent statement or representation . . .

shall be fined under this title, imprisoned not more than 5 years. . . .

The elements of the crime are as follows:

1.    The defendant made a false statement in a matter within the jurisdiction of the FBI.

2.    The defendant acted willfully, that is deliberately, and with the knowledge that the statement was untrue.

3.    The statement was material to the FBI's activities or decisions.

**IV.   EVIDENTIARY ISSUES**

    **A.   Admissions of Defendant**

    The government will seek to introduce certain statements made by the defendant, including statements captured on microphone and telephone recordings during the investigation, his recorded and unrecorded post-arrest interviews, and statements he made to co-workers and other third parties.  Such evidence is admissible as "admissions by a party opponent."  FRE 801(d)(2)(A).

    It is well settled that a statement by a party may be offered against him as an admission, and is therefore nonhearsay.

17

<u>United States v. Nixon</u>, 418 U.S. 683, 702, n. 13 (1974); <u>United States v. Warren</u>, 25 F.3d 890, 895 (9th Cir. 1994)("A defendant's own out-of-court admissions . . . surmount all objections based on the hearsay rule . . . and [are] admissible for whatever inferences the trial judge [can] reasonably draw").

It is also established that writings, such as correspondence, by a defendant may constitute admissions.  <u>United States v. Moran</u>, 759 F.2d 777, 786 (9th Cir. 1985).

Although the government may offer a statement into evidence against a defendant as an admission, the defendant cannot offer his prior statements on his own behalf for proof of the truth of the matter asserted therein since these self-serving statements are hearsay.  <u>See</u> <u>United States v. Ortega</u>, 203 F.3d 675, 682 (9th Cir. 2000) (defendant could not introduce non-self-inculpatory statements because they were inadmissible hearsay).

In <u>Williamson v. United States</u>, 512 U.S. 594, 600 (1994), the Court declared that the "fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability."  The Court went on to find that there was "no reason why collateral statements, even ones that are neutral as to interest . . . should be treated any differently from other hearsay statements that are generally excluded").  If a defendant were allowed to introduce his exculpatory statements without subjecting himself to cross-examination, he would be doing precisely what the hearsay rule forbids.  <u>United States v. Fernandez</u>, 839 F.2d 639, 640 (9th Cir. 1988).

////

18

**B. Statements of Co-Conspirators**

The government intends to offer into evidence statements by the other defendants in this case.  These statements were made during recorded telephone calls and by microphones during the investigation.

Pursuant to Rule 801(d)(2)(E), statements of a co-conspirator made in furtherance of the conspiracy are not considered hearsay, and are admissible against a defendant without a showing that the declarant is unavailable.  See United States v. Inadi, 475 U.S. 387 (1986); United States v. Layton, 720 F.2d 548, 555 (9th Cir.).  Moreover, such statements are not barred by the rule enunciated in Bruton v. United States, 391 U.S. 123 (1968).  Bruton does not apply to statements made by co-conspirators during the course and in furtherance of the conspiracy.  United States v. McCown, 711 F.2d 1441, 1448-49 (9th Cir. 1983).

To admit a co-conspirator's statements against a defendant, the government must establish that the conspiracy existed by a preponderance of the evidence; that the declarant making the statement was a member of the conspiracy; and that the statement was made during the course of and in furtherance of the conspiracy.  Bourjaily v. United States, 483 U.S. 171, 175-76 (1987); United States v. Mason, 658 F.2d 1263, 1269 (9th Cir. 1981).  A showing of the unavailability of declarant is not necessary.  United States v. Paris, 812 F.2d 471, 476-77 (9th Cir. 1987).  Additionally, the person to whom the statement was made need not have been a member of the conspiracy.  United States v. Williams, 989 F.2d 1061, 1068 (9th Cir. 1993).

19

The order of proof is in the sound discretion of the trial judge.  The general rule is that a "trial court may make the conspiracy determination either prior to trial or during trial, or may conditionally admit coconspirator hearsay prior to a finding of conspiracy involvement, subject to the hearsay being 'connected up' to the alleged conspirator."  <u>United States v. Powell</u>, 982 F.2d 1422, 1432 (10th Cir. 1992); <u>see also United States v. Zavada-Serra</u>, 853 F.2d 1512, 1514 (9th Cir. 1988).

The Court has already granted the government's motions in limine to admit certain statements by Gu Weihao and by the co-defendants made during questioning following their arrests.

**C.  <u>Hearsay</u>**

Defendant has given notice that he intends to offer into evidence statements made by Harvey Cohen to defendant's investigator.  Mr. Cohen has since died.  The statements that defendant intends to offer relate to whether defendant worked on military projects.

The statements are inadmissible hearsay.  They are out of court statements offered to prove the truth of the matters asserted.  No hearsay exception applies.  The statements by Mr. Cohen were not under oath, the government was not present at the interview, and therefore had no chance to cross-examine Mr. Cohen.  At trial, the government will object to the admission of any statements by Mr. Cohen through defendant's investigator.

**D.  <u>Documentary Evidence</u>**

**1.  <u>Authentication of documents</u>**

The requirement of authentication is satisfied by evidence sufficient to support a finding that the matter in question is

20

what its proponent claims.  F.R.E. 901(a).  The government "need
only make a prima facie showing of authenticity so that a
reasonable juror could find in favor of authenticity." United
States v. Workinger, 90 F.3d 1409, 1415 (9th Cir. 1996).

### a.   Self-authentication

Self-authentication of certain documents, pursuant to Rule
902, eliminates the requirement of providing extrinsic evidence
of authenticity.  Included in this category are domestic public
documents under seal: " A document bearing a seal purporting to
be that of the United States . . . or of a political subdivision,
department, officer, or agency [bearing] a signature purporting
to be an attestation or execution" is self-authenticating.
F.R.E. 902(1).  Extrinsic evidence of authenticity is not
required as a condition precedent of admissibility.  Id.

In this case, the government will introduce certifications
bearing the seal of the Department of State and signature of the
Secretary of State that the three charged ITAR documents were on
the United States Munitions List.  The government will also
introduce a certification from the Attorney General of the United
States that defendant never gave notice that he was acting as an
agent of the PRC.

### b.  Chain of custody

The chain of custody required in authenticating an item
depends on whether the item is unique, has been made unique, or
is neither of the above.  Defects in the chain of custody go to
the weight of the evidence and not to the document's
admissibility.  United States v. Harrington, 923 F.2d 1371, 1374
(9th Cir. 1991).  There is, however, a presumption of regularity

21

in the handling of exhibits by public officials.  <u>United States</u>
<u>v. Kaiser</u>, 660 F.2d 724, 733 (9th Cir. 1981).  Absent specific
chain of custody issues raised by defendant, the government will
introduce the evidence seized during the searches in this case
through the case agent, as opposed to calling a different agent
for each search.

### c.  Use of copies

The government intends to offer photocopies of certain
documents into evidence during the trial.  The use of copies is
specifically permitted by Rule 1003 of the Federal Rules of
Evidence, unless a genuine question is raised as to the
authenticity of the original, or unless it would be unfair to
admit the duplicate in lieu of the original.

### E. <u>Summary Witnesses/Admissibility of Charts and Summaries</u>

In light of the volume of documents and their technical
nature, the government intends to offer Steve Schreppler of the
Office of Naval Research as a summary witness.  Mr. Schreppler
will summarize, among other things, documents found in
defendant's possession that match technologies on the tasking
lists.  The government will also offer NCIS analyst Erin
Abernathy who compiled an index of the documents found in
defendant's home based on her review of those documents.
Finally, the government will call FBI Investigative Analyst
Colleen Campbell who prepared a summary of travel by defendant
based on documents found in his home.

Evidence may be summarized by any qualified person who has
examined the original documents and heard the testimony in court.
<u>See e.g.</u>, <u>Goldberg v. United States</u>, 789 F.2d 1341, 1343 (9th

Cir. 1986).  The documents underlying the summaries have been produced to defense in discovery and will be made available in court for inspection.

F.R.E. 1006 allows the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury.  In light of volume of documents found in this case, most of a highly technical nature, the proposed summaries will greatly contribute to the clarity of the presentation and reduce the potential for confusion on the part of the Court or the jury.

The government will move to have the summaries admitted into evidence, and given to the jury for their deliberation.

**F.  Classified Information**

The government intends to make use of one classified document in unredacted form during the trial.  Two classified documents were found is defendant's workspace.  The government intends to use redacted copies of those documents, which will not require any special handling.  The government intends to offer into evidence the classified booklet that was the source of the two articles.  It is not possible to redact that original booklet.  The government will advise the Court and defendant prior to the anticipated use of the classified booklet so that arrangements can be made in advance to clear the courtroom.  The government will bring the classified booklet to Court on the day it will be offered.  The government will leave the classified document with the Court to be placed in its safe, or will retain the classified booklet and make it available when if requested to do so by the Court.

TABLE OF CONTENTS

                                                              PAGE

TABLE OF AUTHORITIES   .  .  .  .  .  .  .  .  .  .  .  .  .  .  iii

II.   **STATUS OF THE CASE** .  .  .  .  .  .  .  .  .  .  .  .  .  2

II.   **STATEMENT OF FACTS** .  .  .  .  .  .  .  .  .  .  .  .  .  2

      A.   **The Copying and Encryption of Defense
           Technology Files** .  .  .  .  .  .  .  .  .  .  .  2

      B.   **Post-arrest Statements by Defendant** .  .  .  .  7

           1.   **Defendant's October 28 statement** .  .  .  .  .  7

           2.    **Defendant's October 30 statement** .  .  .  .  .  7

      C.   **Discovery of Documents Gathered by
           Defendant at His Home** .  .  .  .  .  .  .  .  .  8

      D.   **The Charged Documents** .  .  .  .  .  .  .  .  .  8

           a.   **The first ITAR document** .  .  .  .  .  .  .  8

           b.   **The second ITAR documents** .  .  .  .  .  .  9

           c.   **The third ITAR document** .  .  .  .  .  .  .  9

      E.   **The Encryption Program** .  .  .  .  .  .  .  .  11

      F.   **PPI Security/ITAR Training** .  .  .  .  .  .  .  11

      G.   **Certification by Department of State** .  .  .  .  12

      H.   **Certification by the Attorney General** .  .  .  .  12

III.  **ELEMENTS OF OFFENSES** .  .  .  .  .  .  .  .  .  .  .  12

      A.   **ITAR** .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  12

           1.   **Willfulness** .  .  .  .  .  .  .  .  .  .  .  14

      B.   **ITAR Conspiracy** .  .  .  .  .  .  .  .  .  .  .  14

      C.   **Foreign Agent Charge** .  .  .  .  .  .  .  .  .  16

      D.   **False Statement** .  .  .  .  .  .  .  .  .  .  .  17

IV.   **EVIDENTIARY ISSUES** .  .  .  .  .  .  .  .  .  .  .  .  18

      A.   **Admissions of Defendant** .  .  .  .  .  .  .  .  18

      B.   **Statements of Co-Conspirators** .  .  .  .  .  .  19

TABLE OF CONTENTS (CONTINUED)

PAGE

C.   Hearsay . . . . . . . . . . . . . . . . . . . .   21

D.   Documentary Evidence . . . . . . . . . . . . .   21

     1. Authentication of documents . . . . . . . . .   21

          a.   Self-authentication . . . . . . . . . .   21

          b.   Chain of custody . . . . . . . . . . .   22

          c.   Use of copies . . . . . . . . . . . . .   22

E. Summary Witnesses/Admissibility of Charts and Summaries 23

F. Classified Information . . . . . . . . . . . . .   24

TABLE OF AUTHORITIES

                                                                    PAGE

CASES

Bourjaily v. United States,
     483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . .   19

Bruton v. United States,
     391 U.S. 123 (1968) . . . . . . . . . . . . . . . . . .   19

Goldberg v. United States,
     789 F.2d 1341 (9th Cir. 1986) . . . . . . . . . . . . .   23

United States v. Fernandez,
     839 F.2d 639 (9th Cir. 1988) . . . . . . . . . . . . .   18

United States v. Harrington,
     923 F.2d 1371 (9th Cir. 1991) . . . . . . . . . . . . .   19

United States v. Inadi,
     475 U.S. 387 (1986) . . . . . . . . . . . . . . . . . .   19

United States v. Kaiser,
     660 F.2d 724 (9th Cir. 1981) . . . . . . . . . . . . .   21

United States v. Layton,
     720 F.2d 548 (9th Cir.) . . . . . . . . . . . . . . . .   19

United States v. Lizarrga-Lizarrga,
     541 F.2d 826 (9th Cir. 1976) . . . . . . . . . . . . .   13

United States v. Mason,
     658 F.2d 1263 (9th Cir. 1981) . . . . . . . . . . . . .   19

United States v. McCown,
     711 F.2d 1441 (9th Cir, 1983) . . . . . . . . . . . . .   19

United States v. Moran,
     759 F.2d 777 (9th Cir. 1985) . . . . . . . . . . . . .   18

United States v. Nixon,
     418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . .   17

United States v. Ortega,
     203 F.3d 675 (9th Cir. 2000) . . . . . . . . . . . . .   18

United States v. Paris,
     812 F.2d 471 (9th Cir. 1987) . . . . . . . . . . . . .   19

United States v. Powell,
     982 F.2d 1422 (10th Cir. 1992) . . . . . . . . . . . .   20

United States v. Warren,
     25 F.3d 890 (9th Cir. 1994) . . . . . . . . . . . . . .   17

TABLE OF AUTHORITIES(CONTINUED)

PAGE

United States v. Williams,
      989 F.2d 1061 (9th Cir. 1993) . . . . . . . . . . . . .   19

United States v. Workinger,
      90 F.3d 1409 (9th Cir. 1996) . . . . . . . . . . . . .   20

United States v. Zavada-Serra,
      853 F.2d 1512 (9th Cir. 1988) . . . . . . . . . . . . .   20

Williamson v. United States,
      512 U.S. 594 (1994) . . . . . . . . . . . . . . . . . .   21

STATUTES:

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . .   1

18 U.S.C. § 951 . . . . . . . . . . . . . . . . . . . . . .   1

22 C.F.R. §127.1(a)(1) . . . . . . . . . . . . . . . . . .   1

22 C.F.R. § 127.1(a)(3) . . . . . . . . . . . . . . . . . .   1

22 U.S.C. § 2778(b)(2) . . . . . . . . . . . . . . . . . .   1

C.F.R. 126.1   . . . . . . . . . . . . . . . . . . . . . .   16

Regulation 22 C.F.R. § 127.1 . . . . . . . . . . . . . . .   14