FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JAN - 7 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> CHI MAK, <br><br> Defendant. | Case No.: SACR 05-293 (B) CJC <br><br> **ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL** |

Defendant Chi Mak seeks judgment of acquittal or, in the alternative, a new trial, on account of certain alleged defects in his trial and conviction. Specifically, Mr. Mak argues that the statute under which he was convicted on three counts was unconstitutionally vague, that the Government proffered improper expert testimony on rebuttal, and that the Government denied Mr. Mak due process by refusing to grant use immunity to one of Mr. Mak's witnesses, Dr. Yuri Khersonsky. The Court finds that Mr. Mak's constitutional rights have not been violated, and that there were no procedural violations during the trial that would warrant either judgment of acquittal or a new trial. Accordingly, Mr. Mak's motion is DENIED.

# I.    FACTUAL BACKGROUND

On October 28, 2005, Mr. Mak's brother, Tai Mak, and his sister-in-law, Fuk Li, were arrested at Los Angeles International Airport prior to boarding a flight to Hong Kong.  When they were arrested, the Government also seized a CD from their luggage.  Alongside several innocuous files, the CD contained three encrypted files containing export-controlled naval technology.  Chi Mak had provided these files to his brother, who then encrypted the files and placed them on the CD.  Shortly after the arrests of Tai Mak and Fuk Li, the Government arrested Chi Mak and his wife, Rebecca Chiu.  During a subsequent search of Chi Mak's house, the Government discovered numerous other documents containing protected military technology.  The Government also discovered evidence that Mr. Mak had been in contact with officials in the Chinese government.  Mr. Mak was indicted and ultimately charged with five counts: conspiracy to violate the Arms Export Control Act, two counts of attempting to violate the Arms Export Control Act, operating as an agent of a foreign government in the United States, and lying to a federal agent.

Mr. Mak's trial commenced on March 27, 2007.  After a twenty-five day trial, including four days of jury deliberations, the jury found Mr. Mak guilty on all five counts.  In this motion, Mr. Mak raises two incidents that occurred during trial as grounds for either a new trial or judgment of acquittal.  First, the Government informed the Court that it had evidence that two of Mr. Mak's witnesses, Dr. Thomas Lipo and Dr. Yuri Khersonsky, had published export-controlled information without obtaining prior approval, in possible violation of the export control laws.  Accordingly, both witnesses were advised of their rights against self-incrimination prior to testifying.  Dr. Lipo ultimately decided to testify on behalf of Mr. Mak, but Dr. Khersonsky decided to invoke his Fifth Amendment rights and thus did not appear as a witness in this case.

Second, Mr. Mak and his expert witnesses testified at trial that, despite its title, the technology described in the document entitled "5MW High Efficiency Quiet Electric Drive Demonstrator" ("QED Document") had nothing to do with making an engine run more quietly.[1]  In response to this testimony, the Government asked its expert witness, Steven Schreppler, to prepare a simulation demonstrating the effect of the QED technology on engine noise.  Mr. Schreppler concluded this simulation on May 2, 2007, and the Government provided it to the defense on the next day, which was the same day that Mr. Schreppler appeared in court to provide rebuttal testimony and present the simulation to the jury.

## II.   LEGAL ANALYSIS

Mr. Mak seeks judgment of acquittal or, in the alternative, a new trial, on three separate grounds.  First, he argues that the portion of the Arms Export Control Act under which he was convicted is unconstitutionally vague.  Second, he argues that the Government's late disclosure of Mr. Schreppler's simulation violated the disclosure requirements of Federal Rule of Criminal Procedure 16.  Finally, he argues that Dr. Khersonsky's decision to invoke his Fifth Amendment right against self-incrimination was the product of government misconduct, and thus denied Mr. Mak his due process rights.  The Court will consider each of these contentions in turn.

### A.   Vagueness Challenge to 22 U.S.C. § 2778

Three of the five counts on which Mr. Mak was convicted involve application of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and certain of its

---

[1] The QED Document was one of the encrypted files on the CD seized at Los Angeles International Airport.  Count 3 of the indictment charged Mr. Mak with attempting to export the QED Document without a license, and the jury convicted Mr. Mak on this charge.

implementing regulations, 22 C.F.R. §§ 127.1(a)(1)(d) and 127.3. The AECA authorizes the President to control the import and the export of certain items designated as defense articles and defense services. *See* 22 U.S.C. § 2778(a)(1). One of the means by which the export of these items is controlled is through a licensing requirement.

> Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter . . .

22 U.S.C. § 2778(b)(2). The regulations implemented under the authority of the AECA further make it unlawful to attempt to export any defense article or technical data for which a license is required without obtaining such a license. *See* 22 C.F.R. § 127.1(a)(1).[2] The AECA provides for criminal liability for "[a]ny person who *willfully* violates any provision of this section . . . or any rule or regulation issued under [this] section." 22 U.S.C. § 2778(c) (emphasis added).[3] Mr. Mak argues that the AECA and its implementing regulations are unconstitutionally vague as applied to him because they failed to provide adequate notice that his attempted exportation of the QED Document and the Solid State Document was illegal.

"Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be

---

[2] "Technical data" is defined in the regulations as information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1). For purposes of the regulations, information that is in the public domain, as defined in 22 C.F.R. § 120.11, is not technical data. 22 C.F.R. § 120.10(a)(5).

[3] 22 C.F.R. § 127.3, which Mr. Mak also challenges, describes the penalties for violation the AECA and its regulations. It simply provides that any violator of the AECA or its regulations will be subject to the penalties set forth in 22 U.S.C. § 2778(c). *See* 22 C.F.R. § 127.3.

1  held criminally responsible for conduct which he could not reasonably understand to be
2  proscribed.'" *Buckley v. Valeo*, 424 U.S. 1, 77 (1976) (quoting *United States v.*
3  *Harriss*, 347 U.S. 612, 617 (1954)).  In order to survive a "void-for-vagueness"
4  challenge, a penal statute must "define the criminal offense with a sufficient
5  definiteness that ordinary people can understand what conduct is prohibited and in a
6  manner that does not encourage arbitrary and discriminatory enforcement.  *Kolender v.*
7  *Lawson*, 461 U.S. 352, 357 (1983).  In cases such as this one, where the vagueness
8  challenge does not involve First Amendment freedoms, the analysis is limited to the
9  facts and circumstances of the case at hand.  *See United States v. Nat'l Dairy Prods.*
10 *Corp.*, 372 U.S. 29, 36 (1963).  The presence of a scienter requirement within a
11 challenged statute may "mitigate a law's vagueness, especially with respect to the
12 adequacy of notice to the complainant that his conduct is proscribed."  *Village of*
13 *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).
14
15         Several circuit courts of appeals, including the Ninth, have relied on the AECA's
16 scienter requirement to reject vagueness challenges to various aspects of the statute.
17 *See United States v. Lee*, 183 F.3d 1029 (9th Cir. 1999); *United States v. Sun*, 278 F.3d
18 302 (4th Cir. 2002); *United States v. Gregg*, 829 F.2d 1430, 1437 (8th Cir. 1987); *see*
19 *also United States v. Swarovski*, 592 F.2d 131 (2d Cir. 1979) (rejecting a vagueness
20 challenge to the AECA's predecessor statute).  This Court agrees.  To convict Mr. Mak
21 under the AECA, the jury had to find that Mr. Mak *willfully intended* to export the two
22 export-controlled documents at issue in this case without obtaining a proper license.
23 *See* 22 U.S.C. § 2778(c); *see also* Jury Instruction Nos. 18, 21.  In order to find that Mr.
24 Mak's conduct was willful, the jury further had to find that he acted voluntarily and
25 intentionally with the purpose of violating a *known legal duty*. *See* Jury Instruction
26 Nos. 20, 23.  Thus, in order for the jury to convict Mr. Mak, it had to find that Mr. Mak
27 knew the documents could not be legally exported from the country and acted with the
28 intent to violate that law.  The scienter requirement eliminates any concern that the

1    statute did not provide Mr. Mak with adequate notice.  Accordingly, the Court finds that

2    the AECA is not unconstitutionally vague.

3

4    **B.    Rebuttal Testimony of Steven Schreppler**

5

6        Mr. Mak and his expert witnesses testified during the trial that the technology

7    described in the QED Document, despite the document's title, had absolutely nothing to

8    do with making a motor quieter, but only focused on making it run more efficiently.

9    *See, e.g.*, Reporter's Transcript ("R.T.") 4/13/07 at 61:21-62:1 ("[S]o far as phase one

10   and phase two, there is absolutely nothing to do with noise.").  After hearing this

11   testimony, the Government's expert, Mr. Schreppler, prepared a brief computer

12   simulation demonstrating the effect of QED technology on an engine's noise.[4]

13   Specifically, Mr. Schreppler's simulation showed that QED was, in fact, a noise

14   dampening technology.  During his testimony, Mr. Schreppler was careful to note that

15   his simulation was based largely on hypothetical data, and that he did not use any

16   information from a real submarine.  R.T. 5/4/07 at 17:14-20:22.  Thus, his

17   demonstration was not intended to be a fully functioning accurate model of a real-world

18   system.  It was a system level simulation that Mr. Schreppler used to illustrate his

19   testimony regarding QED technology and how sine waves impact noise.

20

21       The Government disclosed this report to Mr. Mak on May 3, the day Mr.

22   Schreppler gave his rebuttal testimony.  Mr. Mak argues that this disclosure is untimely

23   under Federal Rule of Criminal Procedure 16.  He argues that he was prejudiced by the

24   late disclosure because he was not able to have his experts present to review the

25

26   _____

27   [4] In his opening brief, Mr. Mak argued that Mr. Schreppler had been preparing the simulation far in
     advance of the defense's case, and that he would not have had time to prepare the simulation if he
28   started after the defense's experts testified.  However, Mr. Mak in his reply brief concedes that Mr.
     Schreppler's simulation was not prepared until after the defense witnesses testified, and was not
     completed until the day before Mr. Schreppler gave his rebuttal testimony.

1   simulation and provide suggestions for cross examination.[5] These arguments are

2   unavailing.  First, Mr. Schreppler's simulation was unquestionably rebuttal testimony,

3   and as such, is excluded from the disclosure requirements of Rule 16.  Second, the

4   evidence presented by Mr. Schreppler did not substantially influence the outcome of the

5   trial, and thus any error in its admission does not warrant either a new trial or a

6   judgment of acquittal.

7

8       Rule 16 obligates the Government to provide the defense with a written summary

9   of any expert testimony it intends to use during its case-in-chief at trial.  FED. R. CRIM.

10  P. 16(a)(1)(G).  This duty is continuing during the trial; that is, if the Government

11  obtains additional expert testimony, it must promptly disclose its existence to the

12  defense.  FED. R. CRIM. P. 16(c).  Rule 16, by its own terms, applies only to expert

13  testimony that the Government intends to use in its case-in-chief.  Thus, courts have

14  consistently held that the requirements imposed by Rule 16 do not extend to witnesses

15  or evidence offered as rebuttal.  *See United States v. Angelini*, 607 F.2d 1305, 1308-09

16  (9th Cir. 1979) (holding that Rule 16 disclosure "need only extend to witnesses

17  intended to be called in its case-in-chief") (citing *Goldsby v. United States*, 160 U.S. 70,

18  76 (1895)); *United States v. Gering*, 716 F.2d 615, 621 (9th Cir. 1983) (holding that the

19  Government is not required to disclose rebuttal witnesses).

20

21      Mr. Schreppler's testimony and his simulation were clearly rebuttal testimony.

22  The defense elicited testimony during its case-in-chief that the QED technology was

23  entirely unrelated to making an engine run more quietly.  Such testimony was

24  somewhat surprising, given that the plain and clear language of the QED Document

25

26  [5] The defense initially objected to the introduction of Mr. Schreppler's simulation prior to the start of
    his testimony.  At that time, the Court overruled the objection, but indicated to defense counsel that if
27  they wanted to renew their objection or request additional time to review the simulation after Mr.
    Schreppler's testimony, they were free to do so.  R.T. 5/3/07 at 56:4-8.  However, the defense elected
28  not to renew its objection or request any additional time, and instead proceeded with cross-examination
    immediately after the direct examination of Mr. Schreppler concluded.  *See* R.T. 5/4/07 at 8:6-11.

indicates that noise reduction is one of the primary goals of the technology. Accordingly, the Government had Mr. Schreppler prepare his simulation to rebut the extreme position taken by the defense and to show that the QED technology functioned to reduce harmonic distortion from an engine, thereby making the engine run more quietly. The simulation was not produced until after the defense witnesses testified that QED technology had nothing to do with noise reduction. Mr. Mak's argument that the Government had this simulation prepared well in advance of trial, but elected to wait until its rebuttal case to present it in an attempt to sandbag the defense, has been rebutted by evidence of the simulation's internal code, which reveals that the simulation was not completed until May 2. Given that Mr. Schreppler's testimony was rebuttal evidence, the disclosure requirements of Rule 16 are inapplicable.[6]

Moreover, any error in allowing Mr. Schreppler's simulation to be presented to the jury was harmless, and thus does not warrant a new trial. An alleged error is harmless if it is "'more probable than not that the erroneous admission of the evidence did not affect the jury's verdict.'" *United States v. Ramirez-Robles*, 386 F.3d 1234, 1244 (9th Cir. 2004) (quoting *United States v. Vizcarra-Martinez*, 66 F.3d 1016-17 (9th Cir. 1995)). Here, it is almost certain that Mr. Schreppler's simulation did not have any material affect on the jury's verdict. First, the issue of whether the QED technology either did or did not make an engine run quieter is completely tangential to two of the genuine issues in the case: (1) whether the documents encrypted on the CD were in the public domain and (2) whether Mr. Mak acted with the requisite intent when he attempted to send the documents to China. These two issues were the main focus of the

---

[6] Moreover, the evidence reflects that Mr. Schreppler's simulation was completed on May 2, 2007, and then disclosed to the defense the next day prior to Mr. Schreppler taking the stand. Therefore, the Government satisfied the continuing disclosure requirement set forth in Rule 16(c) by promptly disclosing the simulation to the defense once it was completed.

trial on the exportation counts pertaining to the QED document.[7]  The bulk of the evidence presented by each party on the QED exportation counts focused on these issues, the jury instructions highlighted these issues, and, ultimately, the jury's verdict on the QED exportation counts depended on its decision with regard to these two issues. Whether or not the QED technology had anything to do with engine noise has minimal, if any, impact on whether the QED technology was in the public domain or whether Mr. Mak committed a willful violation of the export control laws by attempting to export the QED Document.

Second, the defense presented substantial evidence that the QED technology was unrelated to making an engine run more quietly.  Dr. Lipo, Mr. Lee, and Mr. Mak all testified that the QED technology had nothing to do with noise reduction.  Each of these witnesses had worked directly with the technology, and each had decades of experience in the electrical engineering field.  Mr. Mak was not denied the opportunity to introduce evidence that contradicted Mr. Schreppler's description of how the QED technology worked.  Moreover, Mr. Mak suffered no legal prejudice from the fact that his experts were not present in the courtroom during the presentation of Mr. Schreppler's simulation.[8]  As one of the writers of the QED Document, Mr. Mak is equally well versed in the intricacies of QED technology as Dr. Lipo and Mr. Lee.  Accordingly, he could provide meaningful assistance to his counsel in pointing out any flaws with the simulation and preparing for cross examination.  Defense counsel was able to conduct a meaningful cross examination of Mr. Schreppler, even on short notice.  Thus, the presentation of Mr. Schreppler's simulation in no way deprived Mr. Mak of a full and fair opportunity to argue that the QED technology did not affect an engine's noise.

---

[7] The QED technology had nothing to do with three of the five counts on which Mr. Mak was convicted, including operating as an agent of a foreign government in the United States, lying to a federal agent, and attempting to export the Solid State Document.

[8] Mr. Mak has not articulated, and indeed cannot articulate, any legal entitlement to have his experts present in the courtroom during the testimony of the Government's expert.  Moreover, Mr. Mak's experts were not excluded from the courtroom, they were simply unable to attend.

Given that the issue addressed by Mr. Schreppler's simulation had minimal, if any, effect on the genuine issues involved in the trial, and that Mr. Mak was able to introduce substantial evidence during the trial which contradicted the simulation, it is more probable than not that the simulation had no material effect on the jury's ultimate verdict on the exportation counts pertaining to the QED document. The Court is convinced that introduction of the simulation did not deprive Mr. Mak of a fair trial.

## C.    Dr. Khersonsky's Refusal to Testify

Mr. Mak's final argument is that the Court erred by not ordering the Government to provide Dr. Khersonsky with use immunity so that he could testify on Mr. Mak's behalf. As a general rule, a criminal defendant "is not entitled to compel the government to grant immunity to a witness." *United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir. 1991) (citing *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989)). However, there is a limited exception to this rule "in cases where the fact-finding process is intentionally distorted by prosecutorial misconduct, and the defendant is thereby denied a fair trial." *Id.* (citing *United States v. Lord*, 711 F.2d 887, 892 (9th Cir. 1983)). The Ninth Circuit has established a two-part test for determining when the denial of immunity to a defense witness is the product of prosecutorial misconduct. First, "a defendant must show that the evidence sought from the nonimmunized witness was relevant." *Id.* Second, the defendant must provide evidence "that the government distorted the judicial fact-finding process by denying immunity to the potential witness." *Id.* Only where the defendant makes an unrebutted *prima facie* showing of prosecutorial misconduct should the district court hold an evidentiary hearing to determine whether the government intentionally distorted the fact-finding process.[9] *Id.*

---

[9] Ultimately, a defendant bears the burden of proving "substantial government interference with a defense witness's free and unhampered choice to testify" by a preponderance of the evidence. *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) (quoting *United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984)).

In this case, it is undisputed that the testimony to be given by Dr. Khersonsky was relevant to Mr. Mak's defense.  However, Mr. Mak has not provided any evidence to indicate that the prosecutors committed intentional misconduct by denying use immunity to Dr. Khersonsky.

It is undisputed that Dr. Khersonsky presented a paper concerning export-controlled technology at an international conference without obtaining prior approval to do so.  Such conduct is potentially in violation of the export control laws, and had Dr. Khersonsky admitted this conduct on the stand, he would have potentially been incriminating himself.  Prosecutors have an ethical obligation to inform a witness who might incriminate himself of his rights against self-incrimination.  *See Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2005) (quoting ABA Standards for the Administration of Criminal Justice § 3-3.2(b)).  "It is also proper for a prosecutor to so advise a witness whenever the prosecutor knows or has reason to believe that the witness may be the subject of a criminal prosecution."  *Id.*  As the prosecutors in this case had evidence which gave them reason to believe that Dr. Khersonsky may have committed a criminal act and may thus be the subject of a criminal prosecution, they had an ethical obligation to make Dr. Khersonsky aware of this before he potentially made any self-incriminating statements on the witness stand.

In this case, the prosecutors had contact only with Dr. Khersonsky's attorney, Mr. Williams, and did not speak directly with Dr. Khersonsky.  When they called Mr. Williams, the prosecutors stressed that they were not threatening Dr. Khersonsky, but did inform him that they had evidence that Dr. Khersonsky had presented a paper without approval.  Mr. Williams asked if his client was a "target" of an investigation, and the prosecutors responded that the Government considered him more of a potential "subject" than a "target."  At no point in this conversation did the prosecutors tell Mr. Williams that there was an ongoing investigation of Dr. Khersonsky.  Nor did the

prosecutors threaten to bring criminal charges if Dr. Khersonsky testified.[10] At the conclusion of the call, Mr. Williams told that prosecutors that he wanted to discuss the situation with his client. Subsequently, Mr. Williams informed the prosecutors that he was advising Dr. Khersonsky to invoke his Fifth Amendment privilege.

The discussions between the prosecutors and Mr. Williams were fully consistent with the prosecutors' ethical obligations. There is no evidence that the prosecutors threatened, harassed, or intimidated Dr. Khersonsky or Mr. Williams. Nor is there evidence that the prosecutors had any contact whatsoever with Dr. Khersonsky, either before or after he indicated that he would be invoking his privilege. Instead, the evidence reveals that after a full and frank discussion with his counsel, Dr. Khersonsky determined that it would be in his best interest to invoke his Fifth Amendment privilege if he was called to testify during the trial. There is no prosecutorial misconduct where the witness's decision not to testify arises from his own concern about exposure to potential criminal liability. *Williams v. Woodford*, 384 F.3d 567, 603 (9th Cir. 2004) (citing *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001)). As Dr. Khersonsky's decision to invoke his privilege was not the product of prosecutorial misconduct, the denial of use immunity to Dr. Khersonsky did not violate Mr. Mak's right to due process.[11]

---

[10] Dr. Khersonsky testified that he was briefly interviewed by two federal agents soon after Mr. Mak's arrest. Dr. Khersonsky could not recall whether he even discussed the QED technology with the agents. Dr. Khersonsky, however, was certain that the agents did not threaten, harass or intimidate him with criminal investigation or prosecution.

[11] In any event, the Court does not believe that Dr. Khersonsky's testimony would have made a difference in the outcome of the trial. Even assuming Dr. Khersonsky's testimony would have convinced the jury that Dr. Khersonsky did not have the requisite intent to violate ITAR, this testimony would not have shown that Mr. Mak did not have such intent. Dr. Khersonsky and Mr. Mak are not similarly situated for purposes of evaluating their respective state of mind and culpable conduct. Dr. Khersonsky presented a paper concerning export-controlled technology at an international conference without obtaining prior approval to do so. He was not an agent of the People's Republic of China who passed sensitive naval technology to that country.

**III.    CONCLUSION**

Mr. Mak has not established any grounds for the Court to vacate his conviction and order either a judgment of acquittal or a new trial.  Accordingly, his motion is denied.

DATED:      January 7, 2008

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE