1  RONALD O. KAYE (No. 145051)
   MARILYN E. BEDNARSKI (No. 105322)
2  KAYE, McLANE & BEDNARSKI, LLP
   128 North Fair Oaks Avenue
3  Pasadena, California 91103
   Telephone: (626) 844-7660
4  Facsimile: (626) 844-7670
   rok_kmb@earthlink.net
5
   Attorneys for Defendant
6  CHI MAK

7
                   UNITED STATES DISTRICT COURT
8
                  CENTRAL DISTRICT OF CALIFORNIA
9
                         SOUTHERN DIVISION
10

11
   UNITED STATES OF AMERICA,    )   NO. SA CR 05-293-CJC
12                              )
              Plaintiff,        )   **DEFENDANT'S POSITION RE:
13                              )   SENTENCING [FILED
        v.                      )   CONCURRENTLY WITH
14                              )   EXHIBIT A: LETTERS TO THE
   CHI MAK, et al.,             )   COURT**]
15                              )
              Defendant.        )   Date: March 24, 2008
16                              )   Time: 9:30 a.m.
                                )   Court: Hon. Cormac J. Carney
17 _____)

18
19      The defendant, Chi Mak, by and through his attorneys of record, Ronald O.
20 Kaye and Marilyn E. Bednarski, hereby submits the following position paper with
21 respect to sentencing factors.
22                              Respectfully submitted,
23                              KAYE, McLANE & BEDNARSKI, LLP
24
25
   DATED: March 10, 2008    By       /S/
26                              RONALD O. KAYE
                                MARILYN E. BEDNARSKI
27                              Attorney for Defendant
                                Chi Mak
28

I.

**INTRODUCTION**

Mr. Chi Mak is set to be sentenced before this Court on March 24, 2008 at 9:30 a.m. He is 67 years old and, as demonstrated in the letters filed separately with the Court at Exhibit A, is revered by his colleagues, his neighbors and his family.

In the presentence report (PSR), the probation office has calculated an adjusted guideline range of 188 to 235 months, with a high-end recommendation of 235 months. The guideline calculation is based on the counts of the conviction. The defense accepts the guideline calculation based on the jury's verdict, but requests that the Court impose a sentence below the guideline range.[1]

The recommendation of the high-end of the guideline range is based on the probation officer's mere recitation of the government's depiction of the facts of the case, not on any independent analysis or personal assessment of the evidence at trial. Of course, the defense disputes the depiction of the facts of the case presented in the PSR, but for the purposes of sentencing, will not challenge the probation officer's rendition of these facts. The defense does, however, request that the Court reject the high-end recommendation and consider the sentencing factors under 18 U.S.C. § 3553(a) to craft a sentence of 120 months for this man.

On October 28, 2005, Mr. Chi Mak was arrested. Prior to his arrest, the focus of his life was on two things: his fascination with power electronics technology and the love and companionship of his wife, Rebecca Chieu, who Mr. Mak has been in constant company with since 1967. Based on his arrest, and now his conviction in this case, Mr. Mak has lost these two loves of his life. All Mr. Mak has in front of him is his old age, and inevitably the demise of his health. After living a law abiding, productive life surrounded by people interested in learning, the most he has

---

[1] The defense also accepts the recommended fine of $50,000.00. In exchange for accepting this fine, the government will dismiss the civil forfeitur case *United States v.$79,259.02 In Bank Account Funds*, SACV 06-0567-DOC (RNBx) and apply the $50,000.00 directly from the frozen bank accounts.

2

to look forward to are acquaintances in prison with younger men who he has little in common with. This case has destroyed the "golden" years of his life, and left him with virtually no hope of living a life which has any resemblance of joy. This is sufficient punishment for this man.

The defense requests that the Court give Mr. Mak some hope for the future. The probation officer essentially is recommending a life, or more appropriately, a death sentence for this man – with a 235 month sentence, it is likely that Mr. Mak will die in prison. A sentence of 10 years, however, will give him some hope that there is a future. With a ten year sentence, Mr. Mak's projected release will be 215, and he will be 75 years old. Based on the probation officer's recommendation, if Mr. Mak should survive a 235 month sentence, he will be 84 years old upon release. At 75 years of age, Mr. Mak will have the potential to live some level of a productive / involved life. At 84 years old, after 19 years in custody, that potential is very much in doubt.

If Mr. Mak can leave prison in 2015, the world will be very different than when he was arrested: his wife will be deported to the People's Republic; he will have no ability to work on any projects reflecting power or any other type of technology; he will be dishonored by the country he has called his home; and he will be an old man and in all likelihood, will have health problems. But he will likely be alive. There will be nothing gained by sentencing this man to the rest of his life in prison – which a high-end sentence essentially is – for his conduct in this case. He was not convicted of espionage, he was not convicted of treason, he was not convicted of a violent crime, he was not convicted of a single offense which has a statutory maximum of greater than 10 years. The sentence recommended by the probation officer simply is excessive and inhumane.

The defense requests that the Court use the discretion granted by Congress under 18 U.S.C. §3553(a) and find compassion for this man. The letters provided to the Court do not lie – this man is a worthwhile human being who deserves leniency

at the end of his life. Moreover, the Court should consider the disparity of sentencing for Mr. Mak in comparison to co-defendants Tai Mak and Rebecca Chieu.

A ten year sentence for the convicted offenses is just.

## II.

## ARGUMENT

### A. THE DEFENSE REQUESTS THAT THE COURT SENTENCE MR. MAK TO A TOTAL OF 10 YEARS IN CUSTODY

The Court is no doubt aware of the broad ramifications of *United States v. Booker* for this sentencing. The sentencing guideline range is no longer binding on the Court, but is only one of the five factors to be considered in determining the Sentence. *Booker*, 125 S.Ct. at 764-65. The other four factors include: (1) the nature and the circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentencing disparity; and (4) the need to provide restitution. *Id.*; 18 U.S.C. § 3553(a)(1), (a)(3), (a)(6)-(7).

In two recently decided Supreme Court decisions, *Gall v. United States*, 552 U.S. ___ (Dec. 10, 2007), and *Kimbrough v. United States*, 552 U.S. ___ (Dec. 10, 2007), the Supreme Court confirmed the substantial deference that will be given to district courts in sentencing, even where the Court substantially downward departs from the guideline range.

Considering the factors under 18 U.S.C. § 3553, this Court should not follow the guideline range calculated by the probation officer, and sentence Mr. Mak to ten years in custody, where he will be released at 75 years old.

Further, in considering the Section 3553(a) factors, the sentencing guidelines are to be given no more or less weight than any other factor. *See United States v. Jaber*, 362 F.Supp. 2d 365, 370-76 (D. Mass 2005)(providing comprehensive

analysis of why sentencing guidelines do not reflect statutory purposes of punishment); *United States v. Ranum*, 353 F.Supp. 2d 984, 987 (E.D. Wis. 2005)(same).

Other existing statutory provisions that were formerly in conflict with the mandatory nature of the guidelines now provide additional guidance to courts in applying their discretion. 18 U.S.C. § 3661 states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661, *quoted in Booker*, 125 S. Ct. at 760.

Consequently:

> Sentencing will be harder now than it was a few months ago. District courts cannot just add up figures and pick a number within a narrow range. Rather, they must consider all of the applicable factors, listen carefully to defense and government counsel, and sentence the person before them as an individual. *Booker* is not an invitation to do business as usual.

*United States v. Ranum*, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005). If a court adheres too closely to the guidelines, it risks "committing the act that *Booker* forbids – a Guideline sentence based on facts found by a preponderance of the evidence by a judge." *Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005).

As noted in *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc): "*Booker's* profound impact on federal sentencing" is that it "restor[es] the discretion to the sentencing court that the mandatory guidelines had stripped away." *Ameline*, 409 F.3d at 1099 (Wardlaw, J., concurring in part and dissenting in part). Instead of simply following the guideline ranges as in the past, courts are now bound to sentence each defendant as an individual with a proportionate sentence.

Also critical to the sentencing analysis, is that *Booker* establishes a new, independent limit on the sentence that may be imposed. The primary sentencing mandate of Section 3553(a) states that courts must impose the minimally-sufficient

5

sentence to achieve the statutory purposes of punishment – justice, deterrence, incapacitation, and rehabilitation: "the court shall impose a sentence sufficient, but not greater than necessary, comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. § 3553(a).

This "parsimony provision" is not simply a factor to be considered in determining a sentence; it represents a cap above which the Court is statutorily prohibited from sentencing – even when a greater sentence is recommended by the guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989)(Becker, J., concurring in part, dissenting in part).

The district court must consider the other directives set forth in §3553(a) other than the guidelines. Thus, under *Booker*, courts must treat the guidelines as just one of a number of sentencing factors.

These purposes, as set out in § 3553(a)(2), are:

(a)  retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");

(b)  deterrence;

(c)  incapacitation ("to protect the public from further crimes"); and

(d)  rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

Considering the factors described below in conjunction to the sentencing policy imposed by Congress in § 3553(a), this Court should sentence Mr. Mak to a sentence of 10 years in custody. Such a sentence is "sufficient, but not greater than necessary" to accomplish the following four factors:

**Retribution**:

A sentence of 10 years is "just punishment" for a 67 year old man who has spent the last 28 years of his professional life producing important technology for the *benefit* of the United States. As for the offense conduct at issue, testimony or

6

interviews from the only engineers who were on the QED team and who had experience with this technology – Robert Lee, Thomas Lipo, Chi Mak, and Yuri Khersonsky[2] – demonstrates that both the QED and the Solid State documents could not have revealed anything that would compromise United States national security to the Chinese government.[3] The fact that the QED and Solid State documents did not compromise national security is also reflected by the fact that Mr. Khersonsky and Mr. Mak presented these documents at international ASNE conferences, attended by Chinese nationals, and also attended by representatives of the Office of Naval Research, officers, including Admirals, in the Navy, and agents of both the NCIS and the FBI, and that disks containing these documents were widely distributed to the international community present at the conference and purchased by the international community on-line. If the documents at issue truly had the remote potential to damage national security, the government would not have permitted this wide-spread dissemination.

Mr. Mak did not earn any income, nor did he receive any compensation from the People's Republic of China. This is supported by the total absence of any evidence to the contrary. After a year and a half of surveillance of Mr. Mak, with a closed circuit television in his house, audio recordings of conversations in his vehicles, in his employment, and on all of his telephones, seizure of all the documents in Mr. Mak's house, and subpoenaing his bank records, there is *no* such evidence.

As the Court is well aware from the testimony at trial, the two most important

---

[2] Mr. Khersonsky invoked his Fifth Amendment right against self incrimination and did not testify at trial. But throughout this case – his interview with the NCIS agents, his production of the QED and Solid State documents in response to the subpoena by the defense instructing him *not* to produce technical documents, and his testimony during the motion for new trial – Mr. Khersonsky demonstrated his position that the technology at issue did not disclose critical information to the Chinese.

[3] "The base offense level [for §2M5.2] assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States. In the unusual case where the offense conduct posed no such risk, a downward departure may be warranted." §2M5.2 Application Note 1.

7

things in Mr. Mak's life were his work and his wife, Rebecca Chieu. Both have been taken from him as a result of this offense. The loss of the essence of his life, plus a 10 year sentence in a federal prison, is sufficient punishment for a man who will be 75 years old when he is released from prison.

**Deterrence**:

Ten years is a sufficient amount of time in custody and sends a significant message for this prosecution. No one can argue that a 10 year sentence is a lenient sentence for a man of this age. At best, ten years is half of his life expectancy. Such a sentence clearly satisfies the purpose of general deterrence and specifically for the commission of these offenses. Where co-defendant Tai Mak, who purportedly was the contact with Pu Pei Liang in China, is receiving a maximum of 10 years, the message to the public at large is that Mr. Mak's offense could trigger this length of time in custody.

**Incapacitation**:

After a 10 year period in prison, Mr. Mak will be 75 years old when he is released from prison, with no prospect of working in the technology field. If the Court should fear that he may also present a risk of disclosing national security information, it is unequivocal that any technological information that Mr. Mak acquired up to his last days of employment in October of 2005, will be so outdated that he will have no possible technological contributions to provide to any other party – other than discussing older power engineering technology which will be widely dispersed throughout the world technological community by way of the internet.[4]

**Rehabilitation**:

Mr. Mak has no substance abuse problems, and is highly educated. The need for rehabilitation is not an issue in this case.

---

[4] As demonstrated at trial, the Quiet Electric Drive technology at issue in this case had been disseminated on a Chinese industrial, non-military website by the time of the trial in March of 2007.

1. **Mr. Mak's Life History Reveals a Man who was a Hardworking Engineer Who Helped his Colleagues and Contributed Tremendous Gains to the Technological Advancement of the United States**

Filed separately with the Court at Exhibit A are letters from colleagues, neighbors and family members reflecting Mr. Mak's character and life history. Several colleagues, including Mr. Arleigh "Gene" Dotson, Mr. Mak's prior employer and a government witness, highlight his dedication to his work:

> I worked with Chi Mak for almost twenty years. I was president of Teledyne INET, Sector Executive for Magnetek Defense Systems, and President of Power Paragon, Inc. . .
> Chi was a valued employee. He was capable of being sent alone to a site where a problem existed. He would investigate the problem, evaluate the alternative solutions and make a recommendation to solve the problem.

Letter of Aleigh E. Dotson, at Exhibit A.

As suggested by Mr. Dotson, it is undeniable that throughout his career Mr. Mak routinely solved technological problems for the United States government.

Other engineers who worked with Mr. Mak throughout his career also praise his dedication to his work and his commitment to assisting other engineers with their projects.

> I worked with Chi as an engineer in the time frame between 1990 and 2005. Part of this time I was Vice President for Engineering of a division of Teledyne Corp., specializing in military programs, and, after retirement, a technical consultant. I found him to be of good character and responsible. His attitude and performance indicated that personal integrity was very important to him. He was well regarded by his engineering colleagues and worked well with his peers.
> Having known Chi, I sincerely believe that the offense for which he was convicted is totally out of character. Some background information might explain this paradox: Earlier in his career, Chi started working as a designer of rotating electrical equipment; that is, motors and generators. With the advent for high power semi-conductor devices, rotating machinery was made obsolete in many applications by static equipment. Because of his inquisitiveness, Chi was able to teach himself the technology associated with semi-conductor circuitry well enough to perform as a project engineer in this new field.

Letter of Jack Feld, attached hereto at Exhibit A.

> I have known the defendant, Mr. Chi Mak, through work since I

9

> came to work at Power Paragon Division of L3-Communications around the end of 1998 until Mr. Chi Mak was arrested [October 28, 2005]. At work, his cubicle was next to mine and I have supported a couple of his projects in test. During the time I have been working for him, he has been known as a detail oriented and generous person as well as a good friend.
> In his projects, he has provided me clear directions and calculations for my testing assignments. If there was any doubt in test result he would deeply analyze it until it was clear. . .
> He could spend his own time to help others to solve technical problems. Many times I came to him for questions from other projects that I have supported. He patiently listened to me through the root of the problems so that he could provide me good answers at the end. . .
> In general, I think he is a knowledgeable person that people can come to for information. He is also an easy going person that people can come if they need help. His willingness to help and eagerness to solve problems, I think he may easily be a victim people can take advantage of.

Letter of Paul Huynh, attached hereto at Exhibit A.

> Between the years 1988 through 1991, Chi Mak and I were very close colleagues. At that time, Chi Mak was considered the company expert with Motor Generators. I personally did not have knowledge of this engineering field and was instructed to approach Chi Mak. It was during this introduction that I realized that Chi Mak was unique. He immediately offered his knowledge and was patient and kindhearted. At that time Chi Mak had difficulty with the English language. He would apologize for his Chinese accent, but would always add an element of humor. This struck me as unusual. The humor was brilliant, and he would always associate it with self ridicule. This was his nature. Make others feel comfortable in his presence. There were other times that reinforced his character. Each time an employee would experience hardship, Chi Mak was right there. He was always considerate of people around him.

Letter of Gerald L. Smith, attached at Exhibit A.

Thus, Mr. Mak's colleagues universally speak about his generous nature and his unwavering commitment to assist them in their technological projects. Moreover, there is no witness who stood up in trial or outside of court and remotely opined that he had any intention to harm the United States.

In fact, throughout the trial, witness after witness from L3-Power Paragon, and from Mr. Mak's prior companies, testified about his expertise, his reliability, and that he was the ultimate team player. Further, evidence at trial further demonstrated that Mr. Mak's evaluations from his employers were outstanding. Whatever conduct the

government claims Mr. Mak committed, no one can ever dispute the tremendous positive impact he had on his company and his co-workers in developing technology for the benefit of the United States.

### 2. Mr. Mak Has Lived a Life Marked by his Generosity and Support to his Neighbors and Family

Due to Mr. Chi Mak's stable residence at his home in Downey for the past 25 years, several neighbors express their respect for Mr. Chi Mak with the Court. For example:

> I recently turned 31 years old and he and his wife, Rebecca have lived across the street from my family ever since I can recall. As a child growing up, I recall times when I fell off my bicycle and he would come running to make sure I was okay. I remember times my dad was getting lumber or unloading heavy items from our car and Mr. Mak would always come over asking if my father needed a hand.
> They are very pleasant people and just like most of our neighbors, have lived here my entire life, so we always watch out for each other. . .
> I remember when they first flew the American Flag. They had such pride and asked my father, a Vietnam veteran, all about flag etiquette. They had just received their citizenship and were extremely excited.

Letter of Andrea L. Larson, attached hereto at Exhibit A.

> I am privileged to write a letter in reference to my relationship with Mr. Chi Mak. My family has lived across the street from Mr. and Mrs. Mak since they purchased their home over 25 years ago. When they moved in, my wife and I went over to welcome them to the neighborhood and the friendship started then. We wave and acknowledge each other almost on a daily basis. We have exchanged Christmas gifts some years as well as fruit from our trees as well as them giving us fruit from their trees. . .
> They are wonderful people and I am very honored to call them not only great neighbors, but also my dear friends.

Letter of Dennis V. Deem, attached hereto at Exhibit A.

Finally, Mr. Mak's niece, Alice M. Wong, gives the Court a description of Mr. Mak's character –  as her uncle.

> I knew Uncle Jack [Mr. Mak's nickname with his niece] ever since I was a small child living in Hong Kong. Uncle Jack and my grandfather were living with us as extended family for many years. . . .

11

> Uncle Jack was always a kind, gentle, and extremely reasonable person. He always encouraged us to seek knowledge and learn. I always thought he is a person who knows something about everything. He is probably the most kind and forgiving person I have ever known. I have never seen him lose his temper. He always seems to find an excuse to forgive the other person. He is also the most law abiding person. He would not speed in the middle of the Sahara Desert if you tell him it is against the law. He always believed in discussion to resolve problems. He does not believe in argument. . .
> I don't think greed or financial gain is the motive for him to commit this act. He lives in the most modest small home in the less than average neighborhood. . .
> I do speculate that the desire to share knowledge and not fully investigate the full impact on the sensitive materials he was in charge in his possession was his ultimate downfall. He also have mistakenly trusted others who misinformed him about the situation. I am convinced that if he knew this was a crime and is illegal he would never commit this act. . .
> I hope my uncle has the opportunity to scrutinize his judgment and his action as a free man and not spend the last few years of his life to the confinement of the federal prison wall.

At trial, every witness, including government witnesses, who knew Mr. Mak personally praised him as a human being. Every witness – be it Mr. Dotson, the former President of Power Paragon, Mr. Mohamed Zazeh, his co-author on the Solid State document, Utomchoke Bhavilai, his co-worker at Teledyne in the early 1980s, or Saba Saba, his colleague at Brown Boveri – the company he worked for when he first came to the United States which made commercial circuit breakers for utilities – spoke about Mr. Mak's commitment to his work, his willingness to help other engineers on technological problems, his unending desire to learn and increase his knowledge, and the good person that he is. Unquestionably, from the people who know him, Mr. Mak is not the nefarious anti-American who the government portrayed him as. Even the agents who interviewed Mr. Mak could not attest to him having any intention of harming the United States.

The sentencing factors under 18 U.S.C. § 3553(a) requires that the Court take this background into consideration to determine what is a necessary sentence for this man. The defense requests that the Court stop and reflect on the letters of those in his professional and personal community, who in some ways risked criticism and alienation by supporting someone who has been portrayed as a traitor, and consider

these sentiments as support for leniency.

### 3. The Court Should take into Consideration Mr. Mak's Age when Sentencing him to Custody

Section 5H1.1 states:

> Age is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

18 U.S.C. § 3553(a) encourages the Court to consider "the characteristics of the defendant" in determining an appropriate sentence. Mr. Mak's age represents a compelling characteristic which should cause the Court to impose a more lenient sentence. As an elderly defendant, Mr. Mak is more prone to abuse in a prison setting. "Management problems with elderly inmates, . . are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, and a need for special physical accommodations in a relatively inflexible physical environment." *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Department of Justice, National Institute of Corrections, 2004 edition, pp 9 and 10. In addition, Mr. Mak's conviction has the potential to trigger violent reprisals from inmates who may incorrectly perceive him to be a traitor to the United States.

A variance from the guideline range on this basis is appropriate. *See United States v. Baron*, 914 F. Supp. 660, 662-65 (D.Mass. 1995)(in bankruptcy fraud, downward departure from range of 27-33 months to probation and home detention to a 76-year old defendant with medical problems which could be made worse by incarceration); *United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005)(in a post Booker decision, a 57 year old defendant convicted of distributing crack-cocaine who faced a guideline sentencing range of 168-210 months received a sentence of 108

months which the court found was necessary to deter others from committing further crimes, but would enable the defendant to be released at 65 years old where the risk of recidivism was very low).  There is no risk of Mr. Mak passing sensitive technological information to another country when he is 75 years old – any technology that Mr. Mak acquired prior to his arrest on October 28, 2005 will be obsolete at that time.

This Court should exercise its discretion to impose a sentence of 10 years to a man who already is of an advanced age.

## C. **BASED ON THE PLEA AGREEMENTS OFFERED BY THE GOVERNMENT FOR THE CO-DEFENDANTS, MR. MAK SHOULD RECEIVE A SENTENCE OF 120 MONTHS**

The Court has the discretion to consider the sentences recommended by the government for other defendants to determine what is an appropriate sentence for Mr. Mak.

In their respective plea agreements, the government agreed that Mr. Tai Mak be exposed to a maximum sentence of 10 years, Ms. Rebecca Chieu be exposed to a sentence of 3 years and renouncing her American citizenship, and both Fuk Li and Billy Mak received sentences of time served.  Further, in the Presentence Report, the probation officer has recommended a sentence of 78 months for co-defendant Tai Mak.

Even adopting the government's theory of the case, the government cannot dispute that: Mr. Tai Mak was the contact with Mr. Pu Pei Liang in Guangzhou, China, and the surveillance tapes reflect that Mr. Pu and Tai Mak had a mutual agreement to provide services to each other based on Mr. Pu's care for Fuk Li's mother.  Further, it was Mr. Tai Mak who orchestrated the encryption of the disks which were supposed to be sent to China.

Also under the government's theory of the case, the government cannot dispute that Ms. Chieu was intimately involved in the  creation of the disks of the QED and

14

Solid State documents at the house, as revealed by the surveillance tapes. The government also cannot dispute that it was Ms. Chieu who had the primary relationship with Mr. Gu Wei Hao, the Chinese government official who the government believes worked directly with Mr. Mak.[5]

As for Ms. Fuk Li and Mr. Billy Mak, although clearly not large players in the underlying conspiracy, Ms. Li purportedly brought the tasking lists to the United States, and Mr. Billy Mak performed the encryption of the disks.

Disparity of sentencing is an established departure in the Ninth Circuit. In *United States v. Daas*, 198 F.3d 1167 (9th Cir. 1999) the defendant was convicted of distributing precursor chemicals for methamphetamine. Two of his co-defendants cooperated, testified against him and received reduced sentences. Even though the two co-defendants lesser sentences were the result of cooperation, the Ninth Circuit held that disparity of sentences was a valid basis for departure for the district court to consider. *See also United States v. Tzoc-Sierra*, 387 F.3d 978 (9th Cir. 2004)(Ninth Circuit affirmed district court's downward departure from range 46-57 months to 36 months on the basis of the disparity of sentences received by the co-defendants).

Even adopting the government's theory of the case, it is unreasonable for Mr. Tai Mak and Ms. Chieu to have sentences that are half or more than half of Mr. Chi Mak's. The conspiracy alleged by the government reflects distribution of technical documents to the People's Republic of China. The evidence at trial reveals that Mr. Tai Mak was the prime contact with the People's Republic, and that Ms. Chieu had a longstanding relationship with family members that had positions within the government. The government highlighted this evidence at trial to demonstrate Mr. Tai Mak and Ms. Chieu's role in the conspiracy, and this evidence should be considered by the Court as a basis to demonstrate the disparity of sentencing for Mr. Chi Mak.

---

[5] There was no witness at trial who ever testified that Mr. Mak ever passed any technical documentation to Gu Wei Hao, or acted as a liaison for any person who passed documentation to Gu Wei Hao. Rather, without any witness discussing the content, the government produced letters at trial discovered in Greg Chung and Mr. Mak's house.

## III.
## CONCLUSION

The Court has the opportunity in this case to truly fulfill the goal of 18 U.S.C. §3553(a): to sentence a man, not solely upon the counts of conviction, but upon his life as a whole. Mr. Chi Mak is an honorable man, who is respected and cared about by *everyone* who knows him. The defense respectfully requests that the Court sentence him to a sentence of 10 years so that he can still have fulfilling years to look forward to in the future.

Respectfully submitted,

KAYE, McLANE & BEDNARSKI, LLP

DATED: March 10, 2008      By_____/S/_____
                           RONALD O. KAYE
                           MARILYN E. BEDNARSKI
                           Attorneys for Defendant Chi Mak