NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
GREGORY W. STAPLES (Cal. Bar No. 155505)
Assistant United States Attorney
      United States Courthouse
      411 West Fourth Street
      Santa Ana, California 92701
      Telephone: (714) 338-3535
      Facsimile: (714) 338-3523
      E-mail:   greg.staples@usdoj.gov


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>CHI MAK,<br><br>          Defendant. | No. SACR 05-293-CJC<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S UNEXHAUSTED MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A);<br>DECLARATION OF GREG STAPLES |

     The government submits its opposition to defendant's amended, unexhausted amended motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) ("Amended Motion").

                              Respectfully submitted,

Dated: June 4, 2020          NICOLA T. HANNA
                             United States Attorney

                             BRANDON D. FOX
                             Assistant United States Attorney
                             Chief, Criminal Division


                                 /s/
                             _____
                             GREGORY W. STAPLES
                             Assistant United States Attorney

                             Attorneys for Plaintiff

                                ii

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

I.    INTRODUCTION..................................................1

II.   STATEMENT OF FACTS...........................................2

      A.    Defendant's Crimes and Sentence........................2

      B.    Incarceration and Projected Release Date...............5

      C.    Defendant's Current Motion for Compassionate Release
            and Failure to Exhaust Administrative Remedies..........5

      D.    Defendant's Positive Test and Lack of Symptoms.........6

III.  LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE....................6

IV.   ARGUMENT.....................................................9

      A.    Defendant Has Failed to Exhaust Administrative
            Remedies, Thus Depriving this Court of Authority to
            Consider His Claims....................................9

      B.    The Serious Crimes Committed by Defendant Preclude His
            Early Release.........................................10

      C.    Defendant Is Not Medically Eligible for Compassionate
            Release...............................................12

      D.    The Cases Cited by Defendant Do Not Support His
            Request for Release...................................16

V.    CONCLUSION..................................................17

# **TABLE OF AUTHORITIES**

DESCRIPTION                                                           PAGE(S)

Table of Authorities

**Federal Cases**

United States v. Russo, No. 16-CR-441
   (LJL), 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020) .......... 13, 15

Shaw v. Bank of America Corp.,
   946 F.3d 533 (9th Cir. 2019) ............................... 6, 8

United States v. Chambliss,
   948 F.3d 691 (5th Cir. 2020) ................................. 7

United States v. Ebbers,
   --- F. Supp. 3d. ---, 2020 .................................. 8

United States v. Greenhut, No. 18-CR-48-CAS,
   2020 WL 509385 (C.D. Cal. Jan. 31, 2020) ................... 7

United States v. Mangarella, No. 06-CR-151,
   2020 WL 1291835 (W.D.N.C. Mar. 16, 2020) .................. 7

United States v. Raia,
   --- F.3d ---, 2020 ....................................... 8, 9

United States v. Wages,
   271 F. App'x 726 (10th Cir. 2008) .......................... 7

United States v. Willis,
   382 F. Supp. 3d 1185 (D.N.M. 2019) ......................... 7

**Federal Statutes**

18 U.S.C. § 951 ............................................... 3

18 U.S.C. § 1001 ......................................... passim

18 U.S.C. § 3582 ......................................... passim

18 U.S.C. §§ 3582 ........................................ 12, 13

22 U.S.C. § 2278 ............................................. 3

28 U.S.C. § 994 ............................................. 6

U.S.S.G. § 1B1.13 ........................................... 9

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.    INTRODUCTION**

3        Having shown no remorse or acceptance of responsibility for the

4 damage he inflicted on our national security, defendant now asks the

5 Court to grant him a compassionate release and cut more than six

6 years from his sentence.  Defendant's request fails for three

7 reasons.

8        <u>First</u>, defendant has not fully exhausted his administrative

9 remedy under 18 U.S.C. § 3582(c)--requiring dismissal of the motion.

10 Defendant filed a request for compassionate release with BOP in

11 October 4, 2019.  Twenty days later he withdrew it, agreeing that his

12 issues had been informally resolved.  He supposedly refiled his

13 request the following day.  However, the request predated the COVID-

14 19 pandemic, and thus did not present the warden with the arguments

15 defendant now makes to this Court about the pandemic.  Defendant

16 filed a third request on March 20, 2020.  Like the other requests, it

17 did not make any of the arguments related to COVID-19 that comprise

18 the current motion.  As BOP was not given the opportunity to consider

19 the new claims raised in the motion, defendant has not fully

20 exhausted his administrative remedy.  The motion should be dismissed.

21        <u>Second</u>, even if the Court could reach the motion's merits,

22 defendant betrayed this country and is not entitled to a sentence

23 reduction.  When imposing the sentence in this case, the Court cited

24 the serious offenses committed by defendant, deeming them

25 "treasonous."  The Court found that defendant poses an ongoing threat

26 to national security given his expertise gained from decades of

27

28

1

access to restricted and classified naval technology – knowledge he could still share with Chinese intelligence agents.

Third, defendant's request for release to avoid contracting the COVID-19 virus is moot in any event. Defendant tested positive for the COVID-19 virus a month ago. Releasing him now will not reverse that. His lack of symptoms a month after a positive test suggests he is not vulnerable to the virus and that BOP is caring for him appropriately.

On these latter two bases, the motion should be denied.

## II. STATEMENT OF FACTS

### A. Defendant's Crimes and Sentence

In October 2004, FBI agents heard defendant, his wife, and his brother make plans for the brother to take stolen defense technology to China. Through FISA-authorized wiretaps and recording devices, the FBI heard defendant tell his brother that he would provide him things to take on the brother's upcoming trip to China. Agents later heard and saw defendant and his wife at home discussing various documents and saving them on disks to give to the brother, who would encrypt them prior to his flight to China.

When the FBI heard that one of the documents defendant was sending related to a cloaking device for nuclear submarines, the decision was made to end a years-long intelligence operation to prevent the document from leaving the United States. Late on the night of October 28, 2005, FBI agents arrested defendant's brother as he was about to board a midnight flight to China. In his suitcase were two encrypted disks containing defense information defendant stole from his employer, Power Paragon. The disks included the

document pertaining to the cloaking device for nuclear submarines, as well as other restricted materials.  Defendant and his wife were also arrested at the same time.

Searches conducted at the time of the arrests uncovered a lifetime of espionage by defendant.  Following his departure from China in the late 1960s, at the height of the Cultural Revolution,[1] defendant took a job at a tailor shop in Hong Kong.  The shop had a large customer base of U.S. Navy officers.  A calendar book was found showing defendant was tracking the movement of U.S. warships in and out of the harbor at Hong Kong, in some instances including the names of the commanding officers, during the Vietnam War.  In defendant's home, agents found thousands of documents related to naval defense systems defendant collected over years of working for Power Paragon.  Also found were tasking lists – instructions from Chinese intelligence agents of specific weapon systems to target for collection.

Defendant was charged with conspiracy to violate export control laws and attempting to export or exporting defense articles in violation of 22 U.S.C. § 2278, acting as an unregistered agent of China in violation of 18 U.S.C. § 951, and false statements in violation of 18 U.S.C. § 1001.  After a six-week trial defendant was convicted.

---

[1] As established by expert testimony at trial, defendant, as a university-educated engineer, would have been considered an elite. Elites were treated harshly during the Cultural Revolution.  They were not given benefits, such as a visa to leave the country.  The suspicious circumstances surrounding defendant's departure, coupled with his immediate collection of information on the movement of U.S. warships in Hong Kong, underscore the fact that from the outset, defendant was allowed to leave China to steal defense secrets from the United States.

1    The Court sentenced defendant to 293 months in prison.  In its

2  Statement of Reasons in support of the sentence, the Court found

3         Mr. Mak betrayed the United States.  We entrusted him with our

4         national security and safety of our courageous men and women in

5         the armed forces.  He betrayed that sacred trust by being an

6         agent of the PRC and attempting to pass sensitive naval

7         technology to that country.  To make matters worse, Mr. Mak lied

8         to avoid prosecution and conviction.  We will never know the

9         full extent of the damage Mr. Mak has done to our national

10        security.  A high end advisory guideline sentence will provide a

11        strong deterrent to the PRC not to send its agents here to steal

12        American military secrets and it will ensure Mr. Mak will never

13        attempt to pass our military secrets to the PRC again.

14  See Statement of Reasons, attached as Exhibit 1, at p. 2.

15    The Court found, in imposing an abuse of trust enhancement, that

16  defendant's security clearance and position as a senior electrical

17  engineer at Power Paragon, a defense contractor for the Navy, "gave

18  him critical access to the technology sought by the PRC, thereby

19  providing him with the opportunity to commit the treasonous crimes."

20  Id. at p. 5.  The Court found defendant engaged in a "trail of lies."

21  This included lying under oath at trial about a design document for a

22  new destroyer that was found on his brother's computer (deleted after

23  it had been encrypted), and a code list found at his home that he

24  used to communicate with his brother about transferring technology to

25  China.  Id. at 6-8.

26    The Court addressed the ongoing threat defendant posed to

27  national security given his knowledge of naval defense programs.

28
                                    4

"Mr. Mak is a brilliant man who has extensive knowledge of this country's naval technology, and a sentence of this length will prevent him from sharing it with the PRC.  Should Mr. Mak outlive his prison term, any defense information he has retained will be outdated and obsolete." Id. at 10.

Finally, the Court addressed defendant's argument for a lower sentence based on his being a "model citizen" up to the time of his arrest.  The Court found that defendant's lack of criminal history, good reputation, and professional accomplishments are what made it possible for him to carry out his crimes.  Id. at 11.  Defendant would never have passed the background check to get access to restricted documents were he not, on the surface anyway, a model citizen.

**B.    Incarceration and Projected Release Date**

Defendant is currently serving his sentence at FCI Lompoc.  His projected release date is not until August 19, 2026.

**C.    Defendant's Current Motion for Compassionate Release and Failure to Exhaust Administrative Remedies**

Defendant filed a compassionate release request in October 4, 2019.  See Ex. 2, p. 2-3.  Defendant withdrew the request twenty days later.  Id. at p. 1.  The acknowledgement defendant signed stated that his issues had been "informally resolved."  Id.  Defendant claims to have refiled the request on October 25, 2019.  See Amended Motion, Ex. H.  The request made no reference to the pandemic, which was then still months away.  The request focusses solely on defendant's age and the attendant infirmities that are common among persons his age.  Similarly, defendant filed another request on March 20, 2020, that made no mention of the COVID-19 pandemic as a reason

5

for his release.  <u>See</u> Exhibit 8, attached herein.  Accordingly, the BOP has not had the opportunity to consider defendant's request in light of the arguments he now makes with respect to the COVID-19 outbreak.

### D.   Defendant's Positive Test and Lack of Symptoms

Defendant tested positive for the COVID-19 virus on May 5, 2020. <u>See</u> Ex. G to Amended Motion at p. 90.  Defendant has not had any of the recognized symptoms of the virus.  <u>Id.</u> at 78.

### III. LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

Because a compassionate release is both drastic and permanent, it is subject to strict statutory conditions:

<u>First</u>, a district court can evaluate a defendant's request for compassionate release <u>only</u> "after the defendant has fully exhausted all administrative rights" before the BOP.  Specifically, a defendant may file a motion:

> after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]

18 U.S.C. § 3582(c)(1)(A).  This requirement is mandatory and jurisdictional.  <u>See</u> <u>Shaw v. Bank of America Corp.</u>, 946 F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion requirements deprive the court of jurisdiction").

<u>Second</u>, in evaluating compassionate-release requests, courts must follow both the statute and binding policy statements.  <u>See</u> 28 U.S.C. § 994(t); USSG § 1B1.13.  Pursuant to those authorities, to be eligible for compassionate release, a defendant must demonstrate: (1) the existence of extraordinary and compelling reasons for release,

within the meaning of the statute; and (2) that he is not a danger to the community.  18 U.S.C. § 3582(c)(1)(A).  The statute requires that any reduction be "consistent with applicable policy statements issued by the Sentencing Commission"--in this case, USSG § 1B1.13.  Id.  As the Supreme Court recognized in Dillon, 560 U.S. at 827, because § 3582(c) permits a sentencing reduction only where it is "consistent with applicable policy statements issued by the Sentencing Commission," such policy statements are binding on a court determining eligibility.

USSG § 1B1.13 explicitly defines the "extraordinary and compelling reasons" that make a defendant eligible for compassionate release.  See 28 U.S.C. § 994(t).  They include, as relevant here, (1) a "terminal illness"; (2) a serious medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; or (3) a defendant who is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." USSG § 1B1.13 (other grounds omitted).  USSG § 1B1.13, comment. (n. 1(A)-(B)).  "[R]ehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." Id., comment. (n.3).

Defendant bears the burden to prove both that he has "exhausted all administrative rights" and that "extraordinary and compelling reasons" exist to support his motion.  18 U.S.C. § 3582(c)(1)(A); see United States v. Greenhut, No. 18-CR-48-CAS, 2020 WL 509385, at *1

7

1    (C.D. Cal. Jan. 31, 2020) (defendant bears the burden of establishing
2    entitlement to sentencing reduction).

3        _Third_, even for defendants who are statutorily eligible,
4    compassionate release is a "rare" and "extraordinary" remedy, within
5    district courts' discretion to deny.  United States v. Chambliss, 948
6    F.3d 691, 693-94 (5th Cir. 2020); United States v. Mangarella, No.
7    06-CR-151, 2020 WL 1291835, at *2-*3 (W.D.N.C. Mar. 16, 2020).
8    Specifically, "it is a rare case in which health conditions present
9    an 'exceptional reason'" to allow for release where detention would
10   otherwise be warranted.  See, e.g., United States v. Wages, 271 F.
11   App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention
12   cases); accord United States v. Willis, 382 F. Supp. 3d 1185, 1188
13   (D.N.M. 2019) ("most courts treat compassionate release 'due to
14   medical conditions [a]s ... a rare event."").  This reluctance to
15   expansively apply compassionate release is grounded in a concern that
16   any less narrow application would yield significant sentencing
17   disparities.  United States v. Ebbers, --- F. Supp. 3d. ---, 2020 WL
18   91399, at *6 (S.D.N.Y. Jan. 8, 2020).

19       Defendant fails to carry his burden because he did not exhaust
20   his administrative remedy, he has not demonstrated extraordinary and
21   compelling reasons for his release.  He suffers no terminal illness
22   or debilitating condition that renders him incapable of caring for
23   himself while in custody.  He has not shown that he is no longer a
24   danger to society.

25

26

27

28

IV.  **ARGUMENT**

    A.  **Defendant Has Failed to Exhaust Administrative Remedies, Thus Depriving this Court of Authority to Consider His Claims**

This Court lacks authority to act on defendant's compassionate-release motion because he has not exhausted his administrative remedy.  Under 18 U.S.C. § 3582(c)(1)(A), the Court "may not modify a term of imprisonment once it has been imposed except" upon a defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  Because this statutory condition has not been satisfied here, the Court lacks authority to adjudicate defendant's claims.  See Shaw, 946 F.3d at 541.

Moreover, failure to exhaust cannot be excused.  Instead, as the Third Circuit recently held, § 3882(c)(1)(A) "presents a glaring roadblock foreclosing compassionate release at this point.  United States v. Raia, --- F.3d ---, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

As noted above, the compassionate release requests defendant submitted in October 2019 predated the COVID-19 pandemic.  The request he filed on March 20, 2020, also made no mention of the pandemic.  Defendant presents no evidence that he raised the concerns in his motion as part of any compassionate release request.  Defendant has not fully exhausted his administrative remedy.  Accordingly, the Court lacks jurisdiction and should dismiss the motion.

9

## B.   The Serious Crimes Committed by Defendant Preclude His Early Release

Even if this Court could reach the merits, defendant's claims fail.  Per the applicable Guideline, courts determine if there are extraordinary and compelling reasons to reduce a sentence only <u>after</u> they consider the § 3553 factors.  <u>See</u> U.S.S.G. § 1B1.13 ("the court may reduce a term of imprisonment . . . if, after considering the factors in 18 U.S.C. § 3553, to the extent they are applicable," the court finds extraordinary and compelling circumstances).  There is no need to search for extraordinary and compelling circumstances here because the severity of defendant's crimes disqualify him from early release.

Defendant does not address the § 3553 factors, in particular the seriousness of his crimes and his continued threat to national security.  Instead he skips to whether he is otherwise eligible.  The question of his eligibility is irrelevant because the gravity of his crimes disqualify him.

As the Court noted in its Statement of Reasons for defendant's sentence, the specifics of the power system of a nuclear submarine are considered the "crown jewels" of the Navy.  Ex. 1, p. 10.  This was the exact technology that defendant gave his brother to deliver to Chinese intelligence officers.  This betrayal was only the last of defendant's repeated transfers of restricted defense information to Chinese intelligence officers, some of which occurred when defendant covertly travelled to China.  As the Court stated, defendant hurt this country in ways that will never be fully known.  What is known is that he has put the lives of American sailors and soldiers, and the security of the country itself, at risk.

10

Defendant did this to a country that granted him entry and citizenship, and where he was entrusted to work on sensitive defense technologies as a respected expert in power electronics.  These facts speak for themselves.  The Court must consider the factors in § 3553, which notably includes the serious nature of the crimes defendant committed.  The defendant's request fails on this factor alone.

Defendant's argues he is no longer a danger to society.  Amended Motion p. 18.  This ignores the Court's explicit finding when it sentenced defendant that his decades of working on classified defense projects gives him a wealth of knowledge he could still share with Chinese intelligence agents.  Defendant's mention of his clean disciplinary record and the classes he teaches while in custody does not address the ongoing danger the Court recognized when it sentenced defendant.  It is the same "model behavior" he engaged in while committing his crimes.

Defendant's claim that he is rehabilitated is unconvincing.  Id. Agents visited defendant in prison in October 2014.  See Declaration of James Gaylord, attached herein, at ¶ 2.  The agents were hoping to learn more about Chinese intelligence gathering efforts and techniques.  Id. at ¶ 3.  Instead, defendant claimed that the government of the United States had been out to get him because he was ethnic Chinese, that tasking lists found in his trash were planted, and that he was innocent.  Id.  Defendant cannot claim to be rehabilitated if he cannot acknowledge he broke the law in the first place.

His motion should be denied.

11

### C. Defendant Is Not Medically Eligible for Compassionate Release

Even if defendant's betrayal of this country did not preclude his early release, he cannot establish "extraordinary and compelling reasons warrant[ing] such a reduction."[2]  As noted above, USSG § 1B.1.13 is binding on this Court.  See Dillon, 560 U.S. at 827. The factors under § 1B1.13 include, as relevant here:

First, the medical condition of the defendant. Specifically, whether the defendant has either a "terminal illness" or a "serious physical or medical condition" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." USSG § 1B1.13, comment. (n.1(A)(i)-(ii)).  This factor does not apply to defendant.  He has neither a terminal illness nor serious medical condition that renders him unable to care for himself in prison.  His cholesterol and blood pressure are high, but he is given medication for those problems.  He claims some problems with his legs and his memory.  This has not prevented him from teaching classes to other inmates.  His infection with the COVID-19 virus has thus far presented no symptoms. Defendant has not carried his burden to show that he has any condition, let alone one that is extraordinary and compelling, that prevents him from caring for himself while in prison. There is no basis under this factor to release defendant.

---

[2] Defendant also cannot satisfy the requirement that he is not a danger to the community, for the reasons set forth in the § 3553 analysis.

12

<u>Second</u>, the age of the defendant.  Specifically, whether defendant is "at least 65 years old," is "experiencing a serious deterioration in physical or mental health because of the aging process," and has served at least 10 years or 75% of his term of imprisonment.  <u>Id.</u>, comment. (n. 1(B)).  Defendant is 79 and has completed at least 10 years of his sentence.  However, he is not experiencing a "serious deterioration" in his physical or mental health.  His blood pressure, high cholesterol, and his aches and pains are typical for persons his age.  In any event, this factor would not outweigh the § 3553 analysis that defendant's grave crimes require that he complete his sentence.

<u>Third</u>, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," his illness, age, and family circumstances.  <u>Id.</u>, comment. (n.1(D)).[3]  This factor does not apply because defendant has not asked the warden to consider his release based on the COIVD-19 pandemic.  There is no basis for the Director of BOP to make such a determination.

The issue of the COVID-19 pandemic is moot in any event.  Defendant tested positive for the COVID-19 virus on May 5, 2020.  <u>See</u> Exhibit G to defendant's Amended Motion at 90.  While prisoners who have tested positive for COVID-19 can meet the "extraordinary and

---

[3] Thus, the Court may consider factors set forth in the relevant BOP regulation governing compassionate release: BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (January 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Those factors make no material difference here.

13

compelling" standard if they have a CDC-recognized risk factor other than age, defendant has not made this showing.  High cholesterol and high blood pressure are not listed as high-risk factors for COVID-19 by the Centers for Disease Control.  <u>See generally</u> Centers for Disease Control, Coronavirus Disease 2019 (COVID-19)--People Who Are At Higher Risk, <u>available at</u> <u>https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html</u> (last accessed June 3, 2020).

In addition, he has been symptom-free.  <u>Id.</u> at 78.  There is no basis to believe he is not being adequately cared for by BOP staff at Lompoc.  "As the circumstances are now, releasing [defendant] from [custody] will not provide him with the protection sought by his motion: relief from the risk of contracting COVID-19."  <u>United States v. Russo</u>, No. 16-CR-441 (LJL), 2020 WL 1862294, at *8 (S.D.N.Y. Apr. 14, 2020).  Moreover, given the positive test, at this time, it is also unclear that defendant or the general public would be made safer by defendant's release.  <u>Id.</u>

Defendant lists a number of conditions that may still afflict those who may not develop full-blown symptoms, such as lung-scarring, blood clotting, and heart damage.  Amended Motion p. 11-14.  Defendant does not explain how releasing an already-infected inmate will lessen those risks.

Defendant claims that BOP staff at Lompoc cannot be trusted to care for him should he develop problems related to his infection.  Amended Motion p. 14, 16.  Defendant implies that BOP did little to nothing to prevent the spread of the virus at Lompoc.  That is not true.  A May 4, 2020 Press Release announced the finalized

construction of a Hospital Care Unit (HCU) inside the confines of USP Lompoc at the medium-security component of the Complex which includes ten double-occupancy, acute care treatment rooms with negative pressure, Patient Intake Room, Nurses Station, Pharmacy, Linen Exchange Room, Biohazard Room, and Medical Supply & Storage. Additionally, FCC Lompoc announced it negotiated a contract for medical personnel, including Doctors, Registered Nurses, Paramedics, Pharmacist, Physician Assistants, Nurse Assistants, and a Clinical Manager, who will work in conjunction with FCC Lompoc Health Services staff.  See Exhibit 3.

BOP took other steps to combat the virus at Lompoc, including the following:

- January 2020 - BOP learns of first COVID case, implements existing plans to control the spread of infectious diseases;

- February 6 – information sheet given to all inmates at Lompoc explaining precautions needed to avoid infection; COVID-19 Task Force formed by BOP;

- March 13 – BOP order to facilities to check inventories, establish quarantine areas; most inmate movements restricted; social visits suspended;

- March 26 – BOP staff directed to use PPE;

- April 1 – inmates secured in their cells for 14 days to decrease spread; allowed outside 2-3 hours per day in small groups with social distancing;

- April 6 – order to issue masks to inmates;

- April 8 – memo to inmates re use of masks; and

- May 5 – 100% of inmates at Lompoc tested.

15

See Declaration of Greg Staples at ¶ 2, attached herein.

Defendant's suggestion that BOP staff at Lompoc cannot be trusted with his welfare because they did nothing to stop the spread of the virus is belied by the facts.  By the time the Court reads this brief, it will be one month since defendant tested positive and he remains symptom-free.  Defendant fails to meet his burden that defendant faces any more peril remaining in custody – in a strictly controlled environment with a hospital unit on site – than he would be if released back into society.

**D.    The Cases Cited by Defendant Do Not Support His Request for Release**

The cases defendant cites where courts have granted compassionate release requests are distinguishable.  Amended Motion p. 17.  None of the defendants in those cases had already contracted the virus.  In the cases cited, release was granted to help the defendants avoid contracting the virus.  Such relief is not possible here.

The cases are not analogous in any event.  In United States v. Wishner, CR 14-712-SJO, the defendant was convicted of fraud causing $130 million in losses to more than 2000 victims.  Ex. 4, p. 1-3.  The defendant in that case was diagnosed with dementia.  Id.  While the loss and number of victims in that case are significant, here the Court already found the loss incalculable, and the number of victims is every person in the country.  In addition, defendant's medical condition is nowhere near as debilitating as dementia in its effect on an inmate's ability to cope while in custody.  The cases are not comparable.  The reasons the court in Wishner reduced the defendant's sentence are not present here.

16

1    In <u>United States v. Gonzalez</u>, 18-CR-232-TOR (E.D. Wash.), the

2    defendant had COPD and significant emphysema, was housed in a jail,

3    as opposed to a prison, that had a high turnover of inmates making

4    quarantines and isolation difficult, and faced a ten-month sentence

5    for conspiracy to commit mail fraud. <u>See</u> Exhibit 7. Defendant never

6    addresses these facts. The severity of crimes is not comparable,

7    given the length of sentences at issue. Defendant is not in a high-

8    turnover facility. And his blood pressure and cholesterol conditions

9    do not expose him to the same risk as someone with COPD and

10   emphysema, which are recognized as high-risk factors by the CDC.

11   The other cases defendant cites are also not analogous. <u>See</u>

12   <u>United States v. Perez</u>, 17-CR-513 (S.D.N.Y) at ECF No. 98, attached

13   as Ex. 5 (defendant serving 3-year sentence for kidnapping released 3

14   weeks early after suffering two "vicious beatings" for which he did

15   not receive follow up care); and <u>United States v. Rodriguez</u>, 07-271

16   (E.D. Pa.) at ECF No. 135, attached as Ex. 6 (defendant had diabetes,

17   a disease with twice the mortality rate for COVID-19 victims, had

18   rehabilitated himself, and was one year shy of being eligible for

19   home confinement).[4]

20   **V.    CONCLUSION**

21   Defendant's motion for compassionate release should be

22   dismissed. Even if the Court could reach the merits of defendant's

23   motion, the motion should be denied for the reasons set forth above.

---

27   [4] The government cannot find the case cited by defendant from
the Northern District of Florida, <u>United States v. Williams</u>, because
28   the citation is wrong.

17

**Declaration of Greg Staples**

I, Greg Staples, declare as follows:

1.   I am an Assistant U.S. Attorney in the Central District of California and am assigned to this case.

2.   I was provided the following information by an attorney for the Bureau of Prisons regarding some of the steps taken by staff at the Lompoc facility to combat the spread of the COVID-19 virus.  The steps include the following:

BOP took other steps to combat the virus at Lompoc, including the following:

- January 2020 - BOP learns of first COVID case, implements existing plans to control the spread of infectious diseases;

- February 6 – information sheet given to all inmates at Lompoc explaining precautions needed to avoid infection; COVID-19 Task Force formed by BOP;

- March 13 – BOP order to facilities to check inventories, establish quarantine areas; most inmate movements restricted; social visits suspended;

- March 26 – BOP staff direct to use PPE;

- April 1 – inmates secured in their cells for 14 days to decrease spread; allowed outside 2-3 hours per day in small groups with social distancing;

- April 6 – order to issue masks to inmates;

- April 8 – memo to inmates re use of masks; and

- May 5 – 100% of inmates at Lompoc tested.

18

1  The foregoing does not include all steps taken by BOP at Lompoc, no

2  does it include measures taken to ensure inmates can speak with their

3  lawyers and family or friends.

4      I declare under penalty of perjury that the foregoing is true.

5  Executed on June 4, 2020, at Costa Mesa, California.

6

7                                          /s/ *Greg Staples*
                                        _____
8                                        Greg Staples

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28